## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| K. TAUSIF KAMAL and SAMUEL EDISON, individually and on behalf of all others similarly situated,<br><br>        *Plaintiffs,*<br><br>v.<br><br>BAKER TILLY VIRCHOW KRAUSE, LLC, BAKER TILLY US, LLP, and DELOITTE, LLP,<br><br>        *Defendants.* | |

## CLASS ACTION COMPLAINT

Plaintiffs K. Tausif Kamal and Samuel Edison (together, "Plaintiffs"), through their undersigned counsel, bring this Class Action Complaint on behalf of themselves and all others similarly situated against Baker Tilly Virchow Krause, LLC; Baker Tilly US, LLP; and Deloitte, LLP.

## NATURE OF ACTION

1.      Aspirity Holdings, LLC (f/k/a Twin City Power Holdings; hereafter, "Aspirity") was a Minnesota energy company that operated from 2006 until entering bankruptcy in June 2017.

2.      Beginning in 2012 and continuing up until the eve of its bankruptcy filing, Aspirity raised capital by selling short-term Renewable Unsecured Subordinated Notes ("Notes") to the general public.

1

3.      On July 1, 2015, Aspirity executed a "restructuring transaction" whereby all of its operating subsidiaries were transferred to a newly formed entity named "Krieger Enterprises" that was owned and controlled by Aspirity's founder, Timothy Krieger.

4.      As part of the restructuring Aspirity also "loaned" more than $22 million to Krieger Enterprises (the "Krieger Loan" or the "Term Loan").

5.      Aspirity classified this transaction as a loan to a related party and treated the receivable as an asset on its balance sheet; however, the purported $22 million "asset" was anything but. The loan was not collectable, and Aspirity had zero visibility into Krieger Enterprises' operations or financials. Consistent therewith, Timothy Krieger misappropriated millions of dollars that should have gone toward repayment of the Transfer, and lost everything else in the energy trading market.

6.      Nonetheless, Aspirity carried the Loan as "asset" on its books from July 1, 2015 until April 2017. As a result, Aspirity's balance sheets were artificially inflated, reflecting assets that did not exist for nearly two years.

7.      Hundreds of investors purchased or renewed Notes from Aspirity on the basis of these materially misleading financial statements that were blessed by the Defendant Auditors. Aspirity raised approximately $1 million per month through its Notes program during this time period.

8.      The misclassification of the Krieger Loan was finally corrected in April 2017. Unfortunately, that correction also resulted in the issuance of a "going concern" warning by Aspirity's auditor. Aspirity immediately ceased all further Note payments, and the company was

placed into bankruptcy soon thereafter. Aspirity's downfall—and its Noteholders losses—has been well-publicized in the local media.[1]

9.      All or virtually all of the Notes issued after the Restructuring are still outstanding. Efforts to claw back funds from Krieger in connection with the Aspirity's bankruptcy case were unsuccessful; Aspirity's bankruptcy Trustee informed the Noteholders that Krieger had supplied a confidential personal financial statement showing that he had few remaining assets such that a judgment on the Trustee's $18 million claim "would in all likelihood be nearly impossible to collect." Ultimately the Trustee recovered approximately $725,000, which barely covered administrative expenses and legal fees and resulted in no recovery whatsoever for Aspirity's Noteholders.

10.     This action is brought on behalf of these aggrieved Noteholders against Aspirity's Auditors. As set forth in more detail below, these Auditors utterly failed to perform the duties required of them under the Auditing Standards promulgated by the Public Company Accounting Oversight Board ("PCAOB") and otherwise during the 20+ month period between the Restructuring and Aspirity's ultimate demise. The Auditors' negligence caused, and perpetuated, the material misrepresentation of Aspirity's financial position for this entire timeframe. Aspirity sold $20 million or more worth of Notes during this time.

## PARTIES

11.     Plaintiff K. Tausif Kamal is, and was at all times mentioned herein, an individual citizen of the State of Texas, and currently resides in that state. He purchased and renewed Aspirity Notes during the class period defined *infra*.

---

[1] *See, e.g.*, https://www.startribune.com/investors-out-30m-as-hard-charging-commodities-trader-files-for-bankruptcy/444744873/.

12.     Plaintiff Samuel Edison is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that state. He purchased and renewed Aspirity Notes during the class period defined *infra*.

13.     Baker Tilly Virchow Krause, LLC is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 1301 W 22nd St. Suite 400 Oak Brook, IL 60523.

14.     Defendant Baker Tilly US, LLP is a corporation organized under the laws of the State of Delaware, with its principal place of business also located at 1301 W 22nd St. Suite 400 Oak Brook, IL 60523.

15.     Defendants Baker Tilly Virchow Krause, LLC and/or Baker Tilly US, LLP (together, "Baker Tilly") served as Aspirity's independent auditor from at least 2015 until on or around April 15, 2016.

16.     Defendant Deloitte, LLP ("Deloitte") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 30 Rockefeller Plaza, New York, NY 10112.

17.     Deloitte served as Aspirity's independent auditor from on or around April 15, 2016, until at least May 2017 or later.

18.     Where appropriate, Baker Tilly and Deloitte are sometimes referred to herein as "Defendants" or the "Auditors."

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), codified at 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds

$5,000,000, in the aggregate, exclusive of interest and costs, and there is diversity between at least one Plaintiff and one Defendant.

20.     This Court has personal jurisdiction over Baker Tilly and Deloitte.

21.      Baker Tilly has two Minnesota offices located at 225 South 6th St, Minneapolis, MN 55402, and 380 Jackson St. Suite 300 Saint Paul, MN 55101. All work that Baker Tilly performed in its role as Aspirity's auditor was performed at these offices, and/or at Aspirity's offices at 16233 Kenyon Avenue, Suite 210, Lakeville, MN 5504 and/or 701 Xenia Avenue, Suite 475, Minneapolis, MN 55416.

22.     Deloitte has a Minnesota office located at 50 South 6th St. Suite 2800, Minneapolis, MN 55402. All work that Deloitte performed in its role as Aspirity's auditor was performed at this office, and/or at Aspirity's offices at 16233 Kenyon Avenue, Suite 210, Lakeville, MN 5504 and/or 701 Xenia Avenue, Suite 475, Minneapolis, MN 55416.

23.     The Auditors availed themselves of this forum through their dealings with Aspirity that give rise to the instant lawsuit. The negligent acts described in this Complaint occurred entirely within the State of Minnesota, materially overstating the assets of a Minnesota company for the ultimate benefit of a Minnesota resident, resulting in harm to investors around the country.

24.     Defendants also have fully staffed offices within Minnesota and offer auditing services to Minnesota companies, both of which require them to maintain continuous and systematic contacts such that they could be considered "at home" within the State.

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because "a substantial part of the events or omissions giving rise to the claim occurred" within Minnesota. 28 U.S. Code § 1391(b)(2).

## FACTUAL ALLEGATIONS

### Background

26.     On July 13, 2006, Minnesota resident Timothy Krieger incorporated Twin Cities Power, LLC ("TCPH") in Minnesota. TCPH would eventually restructure into Aspirity.

27.     TCPH was a holding company for various subsidiaries—all Minnesota companies—that operated across three primary business segments: wholesale trading, retail energy services, and diversified investments.

28.     On February 10, 2012, TCPH registered with the United States Securities and Exchange Commission ("SEC") and started offering Renewable Unsecured Subordinated Notes (previously defined as "Notes") for sale to the public. These Notes were sold in varying increments, ranging from as little as $1,000 to $100,000 or more, and for terms between three months and 10 years.

29.     Over time the Note program became the TCPH's primary source of revenue. Hundreds of investors purchased and renewed Notes from 2012 to 2017, often at a pace of $1 million a month or more. During this time TCPH's, and later Aspirity's, outstanding balance owed on the Notes was typically between $20 million and $30 million at any given time.

### The Restructuring

30.     In the spring of 2015 TCPH began preparing for a "restructuring transaction" whereby TCPH would rebrand as "Aspirity Holdings," focused solely on the retail energy business, *i.e.*, selling electricity to homeowners (hereafter, the "Restructuring").

31.     The retail energy business that would become Aspirity's sole focus was a startup endeavor that would take time to develop into something profitable. Prior to the Restructuring

the vast majority of TCPH's operating revenue was realized through its energy trading subsidiaries ("Legacy Businesses").

32.    TCPH's Legacy Businesses were to be totally divested as part of the Restructuring, with ownership transferred to a newly-formed entity—the aptly named "Krieger Enterprises."

33.    Aspirity would serve as the interim owner of Krieger Enterprises, with control of Enterprises to be transferred to Timothy Krieger in his individual capacity soon thereafter.

34.    After the Restructuring Aspirity would continue to sell Notes. Additionally, Aspirity assumed more than $20 million in outstanding Note debt owed by former TCPH.

35.    As noted above, the retail energy businesses were not expected to be profitable for the foreseeable future, leaving Aspirity with no meaningful ability to repay the outstanding Note debt it would assume through the Restructuring. To offset this debt on Aspirity's books, the company arranged to classify the assumption of debt as a "loan" to Krieger Enterprises (previously defined as the "Krieger Loan" or the "Term Loan"). That "loan" would be repaid in variable installments on an as-needed basis determined by the amount of Note redemptions over the relevant time period, with a maturity date of December 30, 2019.

36.    Krieger Enterprises would repay the $22 million using assets belonging to, and revenues generated by, the profitable energy trading subsidiaries that were being transferred to Krieger Enterprises through the Restructuring. As a safety net, the "loan" was to be guaranteed by the energy trading subsidiaries.

37.    Because the "loan" was between related entities and ostensibly subject to repayment, it would be eliminated in consolidation and thus appear as a revenue-neutral transaction on Aspirity's books.

38.     The Restructuring would also include a transfer of cash held in various energy trading accounts belonging to TCPH's former subsidiaries.

39.     The Restructuring required the approval of a majority of TCPH's Noteholders. In June 2015 a proposal was submitted to the Noteholders asking them to vote on the transaction.

40.     The Restructuring was pitched to as a way to ensure the financial stability of the restructured enterprise by protecting the new holding company and its key subsidiaries from market volatility on the one hand, while ensuring that the cash and revenues from the Legacy Businesses would remain available to pay the principal and interest owed on outstanding Notes, on the other hand. Aspirity would be a public company, just as TCPH had been, with auditors ensuring that its financial statements were presented fairly in accordance with generally accepted accounting principles.

41.     On these bases the Noteholders voted to approve the Restructuring, and the $22 million Krieger Loan closed on July 1, 2015.

42.     Thereafter, 100% of the equity interests in Krieger Enterprises were distributed to Thomas Krieger. This distribution completed the legal separation of the Legacy Businesses from the Aspirity companies—Krieger now had full control of their operations and access to their cash, while Aspirity was now wholly reliant upon Krieger to fund repayment of the $22 million in Note obligations that Aspirity assumed.

43.     In the meantime, Aspirity continued to raise capital through its own Note program whereby investors purchased and/or renewed Aspirity Notes on the basis of Aspirity's supposed financial strength and viability.

<u>Krieger's Inability to Repay the Loan</u>

44.     Six months prior to the Restructuring TCPH reported cash deposits of approximately $25 million. Having this cash on hand was crucial to the company's financial health, as the energy business can be volatile and this cash (i) ensured the company could meet redemption obligations on upcoming short-term Note payments while (ii) still possessing sufficient operating capital to participate in the energy trading transactions that were the core of the company's business.

45.     By the end of 2015 that $25 million in cash had dropped to just $10 million.

46.     The Trustee appointed in connection with Aspirity's bankruptcy proceedings determined that Krieger withdrew nearly $6 million from Krieger Enterprises in 2015; nearly $11 million in 2016; and just over $2.7 million through the first half of 2017. These amounts would have been sufficient to repay the so-called "Term Loan" almost in full.

47.     Bank records reviewed by the Trustee showed that Krieger transferred much of this money into his personal bank account and used another $1 million to purchase a home for himself. During a Rule 2004 examination conducted in connection with the bankruptcy Krieger invoked the Fifth Amendment privilege nearly 400 times.

48.     In addition to the foregoing, Krieger Enterprises suffered substantial operating losses during this same time period, losing $4.6 million in 2015; $8.1 million in 2016, and $6 million in 2017.

49.     Against this backdrop and as set forth in more detail below, Krieger Enterprises was unable to repay the Term Loan, which in turn caused Aspirity to default on its Note

obligations and pushed the company into bankruptcy in this Court before the Hon. Judge Sanberg beginning in June 2017.[2]

<u>The Auditors</u>

50.      Aspirity was a public company required to file reports with the SEC. These reports, including but not limited to quarterly reports (Form 10-Q) and annual reports (Form 10-K), presented Aspirity's balance sheets and other financial data. Material financial events were reported on Form 8-K.

51.      SEC regulations require that annual reports contain certified financial statements. The financial statements must include a two-year audited balance sheet and a three-year audited statement of income and cash flows. Auditors are required to sign the 10-Ks before they are filed with the SEC.

52.      The federal securities laws make independent auditors the "gatekeepers" to the public securities markets. These laws require that financial information filed with the SEC be certified (or audited) by independent public accountants. Without an opinion from an independent auditor, the company cannot satisfy the statutory and regulatory requirements for audited financial statements and cannot sell its securities to the public. The auditor is the only professional that a company must engage before making a public offering of securities **and the only professional charged with the duty to act and report independently from management**.[3]

---

[2] Aspirity's wholly-owned subsidiary, "Aspirity Energy, LLC" filed a Chapter 7 petition in June 2017. *See* No. 4:17-bk-41991 (Bankr. D. Minn.). Aspirity was placed into involuntary bankruptcy in March 2018. *See* No. 4:18-bk-40667 (Bankr. D. Minn.)

[3] *See* SEC Securities Act Release No. 33-7919, Final Rule: Revision of the Commission's Auditor Independence Requirements (November 21, 2000) at Section III.A.

53.    Defendants were Aspirity's auditors following the Restructuring Transaction. In this capacity Defendants performed reviews/audits of Aspirity's financials in accordance with the auditing standards set forth by the PCAOB.

54.    Investors relied on Aspirity's and the Auditors' presentation of financial information in making their investment decisions. This reliance was acknowledged in Aspirity's annual reports that were signed by the Auditors.

55.    The Auditors breached the standard of care required of them, resulting in and perpetuating the material misstatement of Aspirity's financials and other key information as set forth below.

*Baker Tilly:*

56.    Baker Tilly served as TCPH's independent auditor prior to the Restructuring, and after the Restructuring remained as independent auditor for Aspirity until on or about April 16, 2016.

57.    In this capacity Baker Tilly reviewed Aspirity's interim reports following the Restructuring Transaction, and also signed Aspirity's annual report for 2015.

58.    On July 1, 2015, Aspirity filed a Form 8-K announcing that the Restructuring had been approved and that Aspirity's assumption of TCPH's outstanding Note debt would be categorized as a "Loan" on Aspirity's books:

> As part of the reorganization, Aspirity Financial entered into a Term Loan Agreement (the "Term Loan") with Krieger Enterprises. Pursuant to the Term Loan, the Company agreed to loan Krieger Enterprises an aggregate principal amount of $22,205,612.86, with a weighted average interest rate of 14.08%. The maturity date of the Term Loan is December 30, 2019.

> The purpose of the Term Loan is to establish the principle that the financial operations of the Legacy Businesses will be devoted to support the Company's Renewable Unsecured Subordinated Notes (the "Notes"). Accordingly, the monthly repayment schedule of the Term Loan reflects

the maximum possible redemptions of the Notes in such month, the outstanding principal amount of the Notes on July 1, 2015, and the weighted average interest rate of such Notes, subject to monthly true-ups, and a portion of the costs incurred by the Company as a public reporting company. The equity of Krieger Enterprises has been pledged to Aspirity Financial to secure repayment of the Term Loan.

59.     On July 6, 2015, Aspirity filed a Prospectus Supplement further describing the Restructuring as a "Loan."

60.     Baker Tilly was Aspirity's auditor when the 8-K and Prospectus Supplement describing the "Loan" were filed.

61.     Aspirity's internal auditors were keen to label the Krieger Loan as a legitimate, collectable—and most importantly, revenue-neutral—transaction; however, the presentation of the "Loan" in the 8-K and the Prospectus Supplement was incomplete. This was not a conventional loan. Aspirity was assuming $20 million or more in Noteholder debt and relying upon Krieger Enterprises to fund Aspirity's repayment of that debt on a variable basis as obligations came due. Moreover, Aspirity was relying on Krieger Enterprises to do this without any visibility into its operations or financials.

62.     Numerous red flags called into question the ability of Krieger Enterprises to repay the Krieger Loan—chief among them, the fact that $22 million was being "loaned" to Aspirity's controlling shareholder. This was a classic related party transaction requiring specific analysis of the financial capabilities of the related party. *See* AS 2410: Related Parties.

63.     Additionally, Krieger Enterprise's largest receivable – a $20 million note payable by Krieger's childhood friend, Mike Angell, in exchange for the transfer of two TCPH subsidiaries—went into default almost as soon as it was issued. Upon information and belief, Angell never made a single payment on that note. The failure to take action to collect on a $20

million payable should have drawn the Auditors' scrutiny, had they been paying attention. *See* AS 2301: The Auditor's Responses to the Risks of Material Misstatement.

64.     Baker Tilly had an independent duty to evaluate the risks associated with a "significant unusual transaction" like the Krieger Loan. *Id.* In particular Baker Tilly should have evaluated whether that supposed "Loan" was truly arms' length and collectable, exercise "professional skepticism" in its analysis. *Id.*

65.     These duties were further heightened by magnitude of the Restructuring Transaction, which divested Aspirity of all of its revenue-generating assets and left the Company solely reliant upon the newly-created Krieger Enterprises to fund repayment of more than $20 million in assumed Note obligations, imposed heightened duties of review upon Baker Tilly effective immediately upon the consummation of the Loan and issuance of the 8-K. *See* PCAOB Auditing Standard ("AS") 2301.

66.     Notwithstanding the foregoing, Baker Tilly did not undertake any evaluation of the Krieger Loan upon its effective date. This evaluation would have revealed that the Loan was not a revenue-neutral transaction for Aspirity but was instead a liability (due to the assumption of outstanding note obligations without adequate evidence of repayment) or, at a minimum, a contra-asset on account of the significant collectability concerns discussed herein.

67.     Importantly, these duties exist even for interim reports like the 8-K and/or Prospectus Supplement discussed above. *See* AS 4105: Reviews of Interim Financial Information. In this context Auditors should read the proposed interim report to identify potential misstatement issues and perform analytical procedures to assess those issues informed by specific knowledge of the client's business, with an eye toward determining whether the Krieger Loan was "conducted on terms equivalent to those prevailing in an arm's-length transaction." *Id.*

The auditor's assessment of risk, circumstances that create incentive to misstate financials, and the nature of the account or disclosure all inform the scope of this review. *Id.*

68.     To that end, Aspirity's 10-Q for the third quarter of 2015, *i.e.* the three month period immediately following the Restructuring Transaction and the closing of the Krieger Loan, presented the Loan as an "intercompany relationship" that, although eliminated in consolidation, "was constructed on an arm's length basis, contains customary protective provisions for the lender including certain guarantees, collateral, and covenants, and ensures that the cash flows generated by the Legacy Businesses may continue to be used to pay the interest and principal on the outstanding notes."

69.     This statement was incorrect. The Krieger Loan was not an arms' length transaction. It was engineered by Timothy Krieger on both sides of the deal to provide himself with a way to turn TCPH's energy trading businesses into his personal piggy bank.

70.     Critically, the supposed "guarantees" promised in the 10-Q were never executed in writing.

71.     A meaningful audit would have detected the foregoing issues in connection with the post-Restructuring 10-Qs. As noted above, the Auditors owed certain duties of "review" in connection with interim reports, including but not limited to, performing analytical procedures, making inquiries of persons responsible for financial and accounting matters, and where warranted, performing other procedures the accountant considers appropriate to provide a basis for communication material modifications that should be made to the company's interim financials. *See, e.g.*, AS 4105.

72.     These interim reviews are intended to "bring to the accountant's attention significant matters affecting the interim financial information."

73.     Baker Tilly was aware that investors relied on Aspirity's public statements in making investment decisions. In spite of this awareness, Baker Tilly failed to apply required procedures for evaluating the presentation of the Krieger Loan. *See, e.g.*, AS 2410; 2301; 4105, *supra*.

74.     These required procedures included, but were not limited to, evaluating the collectability of the Krieger Loan and Krieger Enterprises' use of cash ostensibly intended to repay the Loan, as well as testing to gauge whether the promised guarantees were actually in place as represented.

75.     Aspirity openly acknowledged that it was entirely dependent upon repayment of the Krieger Loan to satisfy its own obligations to Noteholders. Under these circumstances AS 1101 imposed a heightened duty to minimize "detection risk," *i.e.,* the risk that the procedures performed will not detect a material misstatement, where, as here the risk of a misstatement is heightened. In other words, the greater the risk, the greater the burden on the Auditors to implement processes that will minimize the risk of a misstatement.

76.     Baker Tilly did not implement any of the required procedures. Instead, it simply rubber-stamped Aspirity management's presentation of the Loan as a collectable related party transaction that was appropriately eliminated in consolidation.

77.     This neglect is underscored by the relative simplicity of Aspirity's financials. Aspirity had a simple balance sheet reflecting a single large outstanding liability (*i.e.*, the Note obligation) and a single large offsetting "asset" in the form of the payable on the Krieger Loan. This supposed "asset" was hands-down the largest asset Aspirity had on its books, and the fact Baker Tilly did nothing to assess the accuracy of its presentation of that single asset begs the question of what, exactly, Baker Tilly was doing during this time.

78.     Moreover, during the second half of 2015 Aspirity consolidated Krieger Enterprises as a variable interest entity. As such, Baker Tilly had ready access to Krieger Enterprises' financials and could have analyzed those financials to determine that the Krieger Loan was not properly presented as a revenue-neutral transaction suitable for elimination in consolidation.

79.     Had Baker Tilly evaluated the Loan as required it would necessarily have been required to discuss with Aspirity's internal audit committee that the Loan should have been reclassified as a liability and/or contra asset. If the committee refused, additional measures, including corrective disclosures and/or reference to regulators, would have followed. *See, e.g.*, AS 2905; AS 2401.

80.     Baker Tilly chose not to do any of the foregoing, and because of Baker Tilly's neglect, Aspirity's financials were artificially inflated as of the inception of the Term Loan.

81.     This inflation persisted throughout the second half of 2015 and beyond.

82.     The day after the third quarter of 2015 ended, Aspirity and Krieger Enterprises executed an amendment to the Term Loan Agreement that altered certain of Krieger Enterprises' financial reporting provisions. This, too, was ignored by Baker Tilly.

83.     Perhaps coincidentally, during this same time frame Krieger Enterprise's cash decreased by millions of dollars (much of which went into Krieger's pocket).

84.     All the while, investors were purchasing Aspirity's Notes at the rate of $1 million a month, and sometimes more.

85.     Effective in the first quarter of 2016, Aspirity decided that it would no longer consolidate Krieger Enterprises as a variable interest entity. This was a material change from the

prior year, where the Krieger Loan had been treated as a related company transaction eliminated in consolidation from Aspirity's balance sheet.

86.     Aspirity disclosed this change in its 10-Q for the first quarter of 2016. In that report Aspirity stated that its management was "of the opinion that Enterprises likely has sufficient liquidity and operating success to service the debt going forward." Baker Tilly was still serving as Aspirity's auditor at this time, and thus had a duty to review the information in this interim report. *See, e.g.*, AS 4105.

87.     This change in circumstances, *i.e.*, that the Krieger Loan would now appear as an identified asset on Aspirity's balance sheet, should (again) have prompted Baker Tilly to evaluate the Loan for collectability under AS 2410, which applies to related party transactions disclosed in financial statements and requires the auditor to evaluate the financial capability of the related parties with respect to significant uncollected balances and loan commitments.

88.     At a minimum Baker Tilly should have evaluated whether the Term Loan, which for the first time was not being eliminated in consolidation, was truly an arms' length transaction with "customary protective provisions" as claimed.

89.     Baker Tilly also should have evaluated whether Krieger Enterprises—which at this point was now at least $6 million lighter due to Krieger's personal withdrawals, not to mention the operating losses sustained the prior year—was in fact able to satisfy its obligations on the Loan.

90.     In the meantime, investors kept purchasing Notes on the basis of inflated financials hiding the fact that Aspirity had absorbed a $22 million liability.

91.     Around this time Aspirity's Board of Directors decided to replace Baker Tilly with Deloitte. To minimize disruption the Board decided that Baker Tilly would prepare the annual report for year 2015, and Deloitte would take over thereafter.

92.     Aspirity's 10-K for 2015 was filed on April 15, 2016. That report acknowledged that Aspirity's Noteholders relied on the information contained therein in making investment decisions.

93.     Baker Tilly signed that report and certified that in its opinion:

> the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Aspirity Holdings, LLC as of December 31, 2015, and 2014 and the results of their operations and cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.

94.     Baker Tilly failed to exercise reasonable care in making this pronouncement. Baker Tilly had duties to implement audit procedures designed to assess and evaluate Aspirity's decision to treat the Krieger Loan—the most consequential and volatile item on the company's books—as a collectable account properly eliminated in consolidation as of the end of 2015. *See, e.g.*, AS 2301; 2305; 2410.

95.     These duties were heightened in light of the fact that Krieger Enterprises was hemorrhaging cash during the second half of 2015, and that Tom Krieger was withdrawing large chunks of the cash that was available for himself. As the Auditor for the consolidated Aspirity companies, Baker Tilly had access to and thus constructive knowledge (if not actual knowledge) of this information.

96.     Baker Tilly's failures to assess the presentation of the Krieger Loan in the 2015 10l-K is even more damning in light of Aspirity's warning in Item 1-A that its internal controls

over its financial reporting were not effective. In other words, Aspirity acknowledged that its own pronouncements could not be trusted.

97.     Baker Tilly ignored these red flags, and the standards required under the PCAOB, and yet again incorrectly rubber-stamped Aspirity's classification of the Krieger Loan as a revenue neutral transaction.

98.     In reality, Krieger had duped Aspirity into assuming more than $20 million in Note liabilities without any meaningful promise of repayment.

99.     Baker Tilly's failure to discharge its duties as auditor had the effect of overstating Aspirity's balance sheet by approximately $20 million, giving a false appearance of solvency and stability that induced Noteholders to continue purchasing and renewing Aspirity Notes for months to come.

*Deloitte:*

100.    On February 19, 2016, Aspirity's Board of Directors approved appointment of Deloitte to serve as independent public accountant for the fiscal year ending on December 31, 2016.

101.    In connection with this appointment Baker Tilly was to be dismissed upon its completion of Aspirity's 10-K for 2015.

102.    Before accepting a new engagement, incoming auditors are required to communicate with the prior auditor to discuss, *inter alia*, information that may bear on the integrity of management; disagreements as to accounting principles, auditing procedures, or other significant matters; possible issues regarding fraud or internal control related matters; and transactions with related parties and significant unusual reactions. *See* AS 2610.

103.    The successor auditor should also request to review the prior auditor's work papers.

104.    Warning signs abounded suggesting that Deloitte should have closely scrutinized Aspirity's financial picture prior to accepting the engagement. As noted above, at the close of 2014 TCPH had nearly $25 million in cash accounts, which was transferred to Krieger Enterprises as part of the Restructuring. Only a year later that cash balance had dwindled to only $10 million—a decrease of approximately 60 percent. This alone was sufficient to require Deloitte to review the purported "Loan" in connection with its transition.

105.    Under AS 2610, subsequent auditors have a responsibility to take action if they become aware of information suggesting that information in prior financial statements may be misleading.

106.    Notwithstanding the foregoing, Deloitte accepted the engagement without meaningful inquiry into the Krieger Loan or its characterization as an asset.

107.    Thereafter, Deloitte reviewed Aspirity's 10-Qs beginning in the first or second quarter of 2016.

108.    In August 2016 Aspirity issued a 10-Q for the second quarter of 2016 stating that "[Krieger] Enterprises likely has sufficient liquidity and operating success to continue to service the debt going forward."

109.    Deloitte reviewed this 10-Q. As part of that review Deloitte was required to perform analytical procedures, make inquiries of persons responsible for financial and accounting matters, and where warranted, perform other procedures the accountant considers appropriate to provide a basis for communication material modifications that should be made to the company's interim financials. *See, e.g.*, PCAOB AS 4105.

110.   Again, such reviews are intended to "bring to the accountant's attention significant matters affecting the interim financial information."

111.   Deloitte was aware that investors relied on Aspirity's public statements in making investment decisions yet failed to apply required procedures for evaluating Aspirity's statements describing the Krieger Loan. These required procedures included but were not limited to evaluating the collectability of the Krieger Loan; Krieger Enterprises' use of cash ostensibly intended to repay the Loan; and testing to gauge whether the promised guarantees were actually in place as represented. *See, e.g.*, PCAOB AS 2410.

112.   In short, Deloitte made no inquiry to assess Aspirity's true financial condition as of the date of the second quarter 2016 10-Q.

113.   On this basis financials improperly presenting the Term Loan as a valid and collectable receivable—a $20 million asset—were again disseminated to investors.

114.   Had Deloitte performed any meaningful audit processes it would have determined that the statements made in the 10-Q concerning Krieger Enterprise's repayment abilities were false and that the Krieger Loan was not properly booked as an asset. Even a cursory review of Krieger Enterprise's financials would have revealed that the entity was (i) losing money, and (ii) Krieger was withdrawing whatever remained.

115.   Indeed, at that very same point in time Timothy Krieger was working to renegotiate repayment of the Loan due to his inability to continue making the variable payments dictated by recent Note redemptions as required under the original loan documents.

116.   Very soon thereafter, effective November 1, 2016, Aspirity and Krieger Enterprises amended the Term Loan agreement to implement a fixed monthly payment schedule

that Krieger believed would give him the ability to service his debt to Aspirity, at least temporarily.

117.    Aspirity's 10-Q for the third quarter of 2016 was released just a few days after that amendment was executed. Although that 10-Q discussed the amendment as a "Subsequent Event," Deloitte failed to undertake the required review of the consequences of that amendment, and in particular whether those consequences required corrective action to remedy any of the statements contained in the 10-Q—or whether the amendment impacted Aspirity's ability to continue as a going concern. Deloitte was required to make inquiry as to both of these possibilities under AS 2301, 2410 and 4105.

118.    Aspirity's true financial condition was therefore yet again concealed for the next several months.

119.    All the while Aspirity Notes continued to fly off the shelves. Nearly $1.8 million in Notes were sold in the five-week span leaning up to the filing of the 10-Q for the third quarter of 2015. Notes continued to sell at or around this pace until March 2017.

120.    In early 2017 Deloitte began its work on Aspirity's 10-K for year 2016.

121.    On April 28, 2017, Aspirity filed that report with the SEC.

122.    Section 10 of that report, titled "Term Loan Receivable from Related Party," provided as follows:

> In conjunction with the modifications in Amendment 3 [discussed in paragraph 116, *supra*] management evaluated the classification of the Term Loan. Its terms are consistent with those likely available from a third party and there is intention to repay. While the loan is not in default, due to recent losses, the historical volatility of its primary business of wholesale electricity trading, and the level of assets in the business, there is no longer significant evidence of collectability of all amounts owed.
>
> Therefore, effective with the date of the amendment, the **Term Loan is classified on the balance sheet as a receivable from a related party, a**

22

> **contra-equity account**. Subsequent to November 1, 2016, the cost recovery method will be used account for income related to the Term loan. All payments received after the amendment were recognized as equity contributions and reductions to the principal of the loan. Under this method, cash receipts are first applied to reduce the principal balance of the receivable and second to income after all principal has been repaid."

(Emphasis added).

123.   In other words, the 2016 10-K as certified by Deloitte reclassified the Term Loan from a payable (which offset Aspirity's assumption of TCPH's outstanding Note obligations) to a contra-equity account – essentially an account with a negative balance.

124.   Because Aspirity was solely dependent upon the Krieger Loan to repay the outstanding Note obligations, this reclassification was akin to adding a nearly $20 million liability to Aspirity's books. This was a death blow to the company, and on this basis, Deloitte qualified the 2016 10-K with the following "going concern" warning:

> The accompanying consolidated financial statements for the year ended December 31, 2016 have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company's recurring losses from operations, members' deficit, and lack of sufficient cash flows to meet its obligations, including repayment of renewable unsecured subordinated notes, and sustain its operations raise substantial doubt about its ability to continue as a going concern. Management's plans concerning these matters are also discussed in Note 1 to the financial statements. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

125.   The 10-K's reference to the November 2016 amendment as the basis for reclassifying the Krieger Loan as a contra-equity account was a red herring. The considerations identified in the 10-K, *i.e.,* ongoing losses and historical volatility, were present from the inception of the Loan. Indeed, Krieger had just renegotiated the monthly payment amount to decrease that amount to something that he believed Krieger Enterprises was able to carry.

23

126.     In reality, 20+ months of the Auditors' neglect were finally coming to a head. Baker Tilly had rubber-stamped Aspirity's classification of the Krieger Loan as a payable after the Restructuring, and Deloitte had done the same for the better part of a year. The conditions informing repayment of the Loan had not changed—the 10-K acknowledged that the Loan had not gone into default. This was simply the first time any Auditor undertook to actually evaluate the facts and circumstances giving rise to the transaction and to apply actual audit procedures to evaluate the Loan for collectability.

127.     Indeed, assuming, *arguendo*, that the November 2016 Amendment did in fact require reclassification of the Loan as a contra-equity account "effective with the date of the Amendment" as stated in the 10-K, then Deloitte should have detected that and taken appropriate action no later than November 2016.

128.     Under any metric, the fact that the Auditors allowed Aspirity to misrepresent the Krieger Loan on its books from July 1, 2015, until April 28, 2016, represents a gross deviation from the duty of care owed to Aspirity's Noteholders, who the Auditors knew relied upon Aspirity's reports to make their investment decisions.

129.     These Noteholders purchased or renewed tens of millions of dollars' worth of Notes during this time period.

The Aftermath

130.     The issuance of the going concern warning in April 2017 effectively foreclosed Aspirity from selling any more Notes going forward, as no reasonable investor would purchase a promissory note from an entity not expected to survive the coming year.

131.     Around this same time Krieger stopped making payments on the so-called "Loan."

132.    Stripped of its only meaningful revenue sources, Aspirity limped along for the next few months before being going into bankruptcy.

133.    Aspirity did not make any payments on Notes following the issuance of the going concern qualification.

134.    All of Aspirity's outstanding Noteholders lost their entire investment as a result of Aspirity's collapse.

135.    The Auditors' dereliction of duty caused these losses by grossly over-inflating Aspirity's balance sheet, giving the company the false appearance of solvency and stability.

136.    If the Auditors had appropriately classified the Krieger Loan for what it was from the outset—an assumption of $22 million' worth of debt without sufficient indicia of repayment, intended to free up cash for Krieger to siphon from the Company—the Noteholders' losses would have been avoided.

<u>The Named Plaintiffs' Experience</u>

137.    Plaintiff K. Tausif Kamal purchased and/or renewed multiple Notes, first from TCPH and later from Aspirity. These purchases include, but are not limited to, a $20,000 Note with a one-year term that was renewed on September 19, 2015, and again on September 19, 2016; and a $40,000 Note with a two-year term purchased on January 22, 2016. All principal and interest owed on these Notes remains outstanding.

138.    Plaintiff Samuel Edison purchased and/or renewed multiple Notes, including but not necessarily limited to a $5,000 Note with a one-year term purchased on September 19, 2016; a $40,000 Note with a six-month term purchased on October 28, 2016; a $25,000 Note with a one-year term purchased on March 19, 2017; and a $7,500 Note with a one-year term purchased on March 31, 2017. All principal and interest owed on these Notes remains outstanding.

<u>Class Action Allegations</u>

139.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

140.    Plaintiffs bring this action individually and on behalf of all other persons similarly situated (hereinafter referred to as "the Class") pursuant to Federal Rule of Civil Procedure 23.

141.    Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> All persons who purchased or renewed a Renewable Unsecured Subordinated Note issued by Aspirity or TCPH [or any subsidiary or affiliate of either of the foregoing] between July 1, 2015, and April 28, 2017 ("Class Period") and who did not receive the full amount of principal and interest payable under the terms of that Note.

142.    Collectively, these persons will be referred to as the "Class" or "Class members." Plaintiffs represent, and are members of, the Class. Excluded from the Class are Defendants, any entities in which Defendants have a controlling interest, and Defendants' agents and employees, and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

143.    Plaintiffs do not know the exact number of members in the Class, but reasonably believe that Class members number, at a minimum, to be more than 700. The Class can be identified easily through records maintained by Aspirity and/or third-party entities that facilitated Aspirity's Note sales.

144.    The joinder of all Class members is impracticable due to the number of Class members. Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits and inconsistent or

varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class.

145.    Plaintiffs' claims are typical of those of the Class they seek to represent. Plaintiffs and other Class members purchased or renewed Aspirity Notes after Aspirity made the "loan" to Krieger Enterprises. Aspirity was a public company required to be audited by an independent auditor in accordance with the accounting and auditing standards promulgated by the PCAOB. Plaintiffs reasonably relied on the Defendants to faithfully discharge these duties, thus ensuring that Aspirity's financial statements and related information were presented accurately in its public filings and otherwise. All Note purchases or renewals were made in reliance on the accuracy of the same interim and yearly reports filed with the SEC. The negligent acts of the Defendants in performing their audits thus impacted all investors uniformly.

146.    There are well-defined, nearly identical, common questions of law and fact affecting all parties that predominate over questions that may affect individual Class members, including but not limited to the following:

    i.    Whether Baker Tilly was required to evaluate Aspirity's accounting treatment of the Krieger Loan at any point during the Class Period, and whether Baker Tilly failed to perform the required audit procedures necessary for that evaluation;

    ii.    Whether Baker Tilly was required to evaluate the collectability of the Krieger Loan in connection with the July 1, 2015, issuance of the Form 8-K disclosing that a "Loan" had been made, and whether Baker Tilly failed to do so;

    iii.    Whether Baker Tilly was required to make a reasonable investigation of the statements made in the July 6, 2015, Prospectus Supplement filed with the SEC describing the Krieger Loan and to determine whether those statements had a material effect on Aspirity's financials;

    iv.    Whether Baker Tilly properly "reviewed" Aspirity's presentation and discussion of the Krieger Loan in its quarterly reports for 2Q and 3Q 2015, and/or 1Q 2016, including whether Baker Tilly failed to perform any of the duties required of it in connection with those reviews;

27

v.     Whether Baker Tilly negligently failed to perform required audit procedures prior to certifying Aspirity's presentation of its financial statements in its 10-K for year 2015;

vi.    Whether Deloitte undertook appropriate due diligence prior to accepting the Aspirity audit engagement in or around the first quarter of 2016, including what, if any, analysis was performed as to the collectability of the Krieger Loan and the impact that would have on Aspirity' balance sheet;

vii.   Whether Deloitte properly "reviewed" Aspirity's presentation and discussion of the Krieger Loan in its quarterly reports for 2Q and 3Q 2016, and/or 1Q 2017, including whether Deloitte failed to perform any of the duties required of it in connection with those reviews;

viii.  Whether Deloitte discharged its duties as Aspirity's auditor in connection with the November 2016 Amendment to the Krieger Loan, including whether Deloitte properly and promptly reviewed the terms of that Amendment to determine the impact, if any, it had on Aspirity's accounting treatment of the Krieger Loan;

ix.    Whether Deloitte failed to perform required audit procedures prior to certifying Aspirity's presentation of its financial statements in its 10-K for year 2016, including but not limited to whether Deloitte properly assessed the statement that the reclassification of the Term Loan to a contra-equity account was due to the November 2016 Amendment;

x.     Whether Baker Tilly and/or Deloitte raised any issues pertaining to the foregoing with Aspirity's internal auditors;

xi.    Whether Baker Tilly and/or Deloitte should have withdrawn any of their work and/or resigned from the engagement on account of Aspirity's misclassification of the Term Loan; and

xii.   Whether Baker Tilly and/or Deloitte breached any other duties owed to Plaintiffs or the Class Members during the Class Period.

147.   As reflected in the above, Plaintiffs' claims are focused on the conduct of the Auditors in connection with Aspirity's public statements filed with the SEC, the effect of which did not vary between class members. Resolution of these common questions will drive the claims of all Class members toward judgment or resolution; they involve a "fatal similarity" for purposes of the claims of all Class members.

148.    For all these reasons, a class action is the superior method for the fair and efficient adjudication of this controversy.

149.    Plaintiffs and members of the Class have been harmed and continue to be harmed by the foregoing and other acts of the Auditors, which harm includes the total loss of their investments.

150.    Plaintiffs seek damages on behalf of themselves and all Class members, including but not limited to return of their investments, with the interest Aspirity represented would be paid, as well as consequential damages in an amount to be proven at trial.

151.    Plaintiffs will fairly and adequately represent and protect the interests of the Class and have no interests which are antagonistic to any member of the Class.

152.    Plaintiffs have retained counsel experienced in handling class action claims involving investment losses caused by a wide variety of misconduct, including misrepresentation of financial information. Plaintiffs' counsel is experienced in prosecuting the claims of investors against auditors and others who have acted inappropriately to cause investment losses.

153.    Class-wide relief is essential to resolve the claims regarding all investors relating to all responsible parties in an equitable, even-handed fashion.

154.    Plaintiffs therefore seeks certification of the Class pursuant to Rules 23(b)(1)(A) and (b)(3).

155.    Plaintiffs seek certification of a Rule 23(b)(1)(A) class. Adjudicating Defendants' liability for the facts and claims alleged here poses a substantial risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendants if a class is not certified.

156.    Plaintiffs seek certification of a Rule 23(b)(3) class. As detailed above, common questions regarding Defendants' conduct predominate over any individual issues, and a class action is superior to the alternative of hundreds of individual cases involving the same core facts and claims addressed to Defendants' conduct.

157.    In the alternative, Plaintiff seeks certification of an "issues" class pursuant to Rule 23(c)(4). This class would incorporate, and allow for the adjudication of, all issues the Court adjudges to be common to members of the class and subclass, such as one or more of the common issues identified by Plaintiffs, *supra*.

## **CAUSE OF ACTION**

### **Count 1: Negligence**
**(in all forms, including but not limited to negligent performance of audit duties, negligent misrepresentation, and the negligent supply of information for the guidance of others)**

158.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

159.    Aspirity was a public company required to be audited in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB").

160.    Defendants served as Aspirity's auditors from July 1, 2015 until April 2017 or later.

161.    The PCAOB's Accounting Standards required Defendants to, *inter alia*, develop audit responses and procedures to address the risks of material misstatement in Aspirity's public statements. *See, e.g.*, AS 2301. The PCAOB offers specific guidance governing Defendants' responsibilities and procedures in connection with acceptance of the audit engagement, review of interim reports, analysis of material events, and the preparation of annual reports, including but not limited to:

i.     AS 2301: The Auditor's Responses to the Risks of Material Misstatement, requires the auditor to, *inter alia*, evaluate whether the company's application of significant accounting principles, particularly those related to subjective measures and complex transactions, are indicative of bias that could lead to material misstatement. The auditor **must exercise professional skepticism** in connection with this evaluation.

ii.     AS 2301 likewise requires a specific response to "risks associated with unusual transactions," which response includes the **requirement to perform further audit procedures** in response to such transactions.

iii.     AS 2305: Substantive Analytical Procedures, requires an auditor to develop expectations for particular assertions regarding classes of transactions by **identifying and using plausible relationships that are reasonably expected to exist** based on the auditor's understanding of the client and of the industry in which the client operates.

iv.     AS 2410: Related Parties, requires auditors to obtain an understanding of the company's relationships and **transactions with related parties** that may reasonably be expected to affect the risk of material misstatement. This understanding specifically requires the auditor to perform inquiries into the nature of transactions between the company and related parties, and the specific terms and businesses purposes of those transactions. The goal is to identify and assess risks of material misstatement. For all related party transactions disclosed in financial statements, the auditor must review the documentation to determine if the terms are consistent with how the transaction has been represented, and, specifically, to **evaluate the financial capability of the related parties with respect to significant uncollected balances and loan commitments.**

v.     AS 2610: Initial Audits—Communications Between Predecessor and Successor Auditors, imposes duties of communication between the incoming and outgoing auditor to discuss, *inter alia*, auditing procedures and related party transactions. This standard also imposes **responsibility for the incoming auditor to take action** when it becomes aware of information leading it to believe that prior financial statements may require revision.

vi.     AS 2905: Subsequent Discovery of Facts Existing at the Date of the Auditor's Report, requires the auditor to **take action to prevent future reliance** on reports where the auditor becomes aware of information that should have been reflected in the prior report.

vii.     AS 1101 imposes a duty to minimize "detection risk," *i.e.,* the risk that the procedures performed by the auditor will not detect a misstatement that exists and could be material, based on the level of risk of a material misstatement. The higher the risk associated with a misstatement, the lower the detection risk must

be. **Heightened evaluation and analysis are thus required where the risk posed by a misstatement is high.**

viii.   AS 1105 provides that the level of **evidence the Auditor must obtain and evaluate is directly correlated with the risk posed by a misstatement**.

ix.   AS 4105: Reviews of Interim Financial Information, fixes the auditor's **duty to communicate material modifications that should be made to interim reports.** The "review" contemplated by this section includes reading the proposed interim reports to identify possible issues, performing analytical procedures (like comparisons) to assess those issues, obtaining sufficient knowledge of the client's business to identify specific risks of material misstatements associated with those issues, reports, and making inquiries of persons responsible for financial and accounting matters to verify the accounting treatment of significant transactions, related party transactions, or other unusual situations. Notably, this **also requires the auditor to obtain information confirming that related party transactions were "conducted on terms equivalent to those prevailing in an arm's-length transaction."**

(All emphases added.)

162.   The Auditors owed duties of care and competence in performing all of these charges. "Due care imposes a professional responsibility on the auditors to follow generally accepted auditing standards and apply generally accepted accounting principles in auditing the financial statements of a client entity." AS 1015: Due Professional Care in the Performance of Work.

163.   Proper accounting treatment for the Krieger Loan was particularly important insofar as it was essentially the only asset on Aspirity's books. Aspirity had a simple balance sheet reflecting one large liability (the $20+ million assumption of outstanding Note debt effective July 1, 2015) and a single large asset (the purported payable associated with the Krieger Loan) offsetting that liability.

164.   Aspirity's quarterly and annual reports consistently acknowledged that Aspirity was solely dependent upon repayment of the Krieger Loan in order to satisfy Aspirity's obligations on the Note debt.

165.    Categorization of the Krieger Loan as a payable was thus imperative for Aspirity to maintain any semblance of solvency—without it, Aspirity was $20 million or more in debt with no prospect of repayment.

166.    The Auditors breached their above-referenced duties of due care through their ongoing and persistent failures to evaluate the collectability of the Krieger Loan and their consequent blessing of Aspirity's quarterly and annual reports presenting the Krieger Loan as an asset in the form of a payable, all as set forth in more detail above.

167.    The Auditors had ample opportunity to perform the required analyses, beginning with the execution of the Restructuring that saw Aspirity assume $20 million in debt in what was misrepresented to investors as a revenue-neutral transaction, and continuing through the first quarter of 2017.

168.    In addition to the foregoing breaches, the PCAOB's accountings standards also imposed affirmative duties on the Auditors to take appropriate steps to correct misstatements, including advising Aspirity's internal audit committee to make appropriate corrective disclosures where necessary, and, if they refused to do so, withdrawing their reports and/or notifying regulatory authorities of the misstatements. *See, e.g.*, AS 2905; AS 2401.

169.    Neither Baker Tilly nor Deloitte ever discussed the classification of the Krieger Loan with Aspirity's Board of Directors or Aspirity's internal audit committee. No inquiry was ever made by Baker Tilly or Deloitte to Aspirity's management or audit committee concerning the Transfer.

170.    Minnesota law recognizes that investors may pursue direct claims against auditors who breach the foregoing duties.

171.    As a company required to file with the SEC, Aspirity's and the Auditors' public statements regarding its financial condition and otherwise were communicated to investors, like Plaintiffs, who relied upon those statements in making their investment decisions.

172.    Consistent therewith, Aspirity's quarterly and/or annual reports acknowledged that investors relied on the information contained therein in deciding whether to purchase or renew Aspirity Notes.

173.    The Auditors reviewed and signed these reports and, on that basis, had actual and constructive knowledge that Noteholders relied on the information contained in those reports to make their investment decisions.

174.    The Auditors also had access to, and responsibility for reviewing, Aspirity's balance sheets and cash flow statements reflecting the exact number of outstanding Notes coming up for renewal, as well as the number of Notes purchased during any given period of time. Indeed, Aspirity's reports routinely disclosed the number of Notes sold during the period at issue.

175.    The Auditors owed duties to these known and foreseeable investors to communicate accurate information, and to ensure that any information the Auditors communicated to Aspirity was accurately reflected in Aspirity's financials and other public statements.

176.    Throughout the Class Period the Auditors failed to do any meaningful evaluation and instead conveyed inaccurate information to Aspirity, and ultimately the investing public at large, to the detriment of the Noteholders.

177.    If Defendants had acted with due care, they would have determined that the Krieger Loan was not properly booked as an asset, and that the assumption of the outstanding

Note debt thus imperiled Aspirity's ability to continue as a going concern effective immediately upon the Restructuring.

178.    The effect of the Auditors' negligence is that inaccurate financial information about Aspirity was disseminated to the public. This inaccurate information materially inflated Aspirity's balance sheet by $20 million or more, falsely presenting the company as solvent when it was not.

179.    Plaintiffs and other members of the Class reasonably relied on the information contained in Aspirity's reports filed with the SEC.

180.    If the Krieger Loan had been classified correctly from its inception, Plaintiffs would not have moved forward with their Note purchases or renewals.

181.    The consequences of the Auditors' negligence were material and readily foreseeable. The vast majority of Aspirity's revenue depended upon Note sales. No reasonable investor will purchase a promissory note from an entity not expected to survive as a going concern. Consistent therewith, as soon the Auditors reclassified the Krieger Loan from a "Loan" into a contra-equity account, Aspirity's balance sheet instantly reflected unmanageable liabilities, resulting in the issuance of a going concern warning. Aspirity's Note sales ended immediately thereafter, and repayment on existing Notes likewise stopped immediately. A few months later Aspirity was placed into involuntary bankruptcy.

182.    Defendants' breaches of their duties owed to Plaintiffs and Class members proximately caused harm to Plaintiffs, in the form of investment losses, that would not have occurred if Defendants had competently performed the charges as Auditors.

183.    The Auditors are liable for all losses Plaintiffs sustained as a result of the Auditors' negligence in an amount to be proven at trial.

184.    The harm the Auditors caused is unique to the Plaintiffs and Class Members and does not constitute a derivative injury claim. Indeed, Aspirity benefited from the misclassification as it allowed them stay in business for nearly two years after the loan and to continue to sell Notes.

## DEMAND FOR JURY TRIAL

185.    Plaintiffs demand a trial by jury on all counts so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant Plaintiffs and all Class members the following relief against the Defendants:

i.   An order certifying this action as a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Class or Classes and any Subclasses the Court deems appropriate, finding that Plaintiffs are proper representatives of the Class, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class;

ii.  For payment of all principal and interest owed under any Note purchased or renewed during the Class Period;

iii. For all other recoverable compensatory and other damages sustained by Plaintiffs and the Class;

iv.  An award of attorneys' fees and costs to counsel for Plaintiffs and the Class as may permitted by applicable law; and

v.   Such other relief as the Court deems just and proper.


Dated July 1, 2021,                    Respectfully submitted,

/s/*Garrett D. Blanchfield*
**REINHARDT WENDORF & BLANCHFIELD**
Garrett D. Blanchfield (#209855)
Brant D. Penney (#316878)
332 Minnesota Street, Suite W1050
St. Paul, MN 55101
Telephone: (651) 287-2100
Facsimile: (651)-287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com

**PEIFFER WOLF CARR KANE & CONWAY, LLP**
Joseph Peiffer (to be admitted pro hac vice)
Daniel B. Centner (to be admitted pro hac vice)
Grace A. Hancock (to be admitted pro hac vice)
1519 Robert C. Blakes Sr. Drive
New Orleans, LA 70130
Telephone: (504) 523-2434
Facsimile: (504) 608-1465
jpeiffer@peifferwolf.com
dcentner@peifferwolf.com
ghancock@peifferwolf.com

*Attorneys for Plaintiffs and the Proposed Class*