**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

K. TAUSIF KAMAL and SAMUEL
EDISON, individually and on behalf of all
others similarly situated,
                *Plaintiffs,*

v.

BAKER TILLY US, LLP, and DELOITTE,
LLP,
                *Defendants.*

---

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs K. Tausif Kamal and Samuel Edison (together, "Plaintiffs"), through their undersigned counsel, bring this Amended Class Action Complaint on behalf of themselves and all others similarly situated against Baker Tilly US, LLP (f/k/a Baker Tilly Virchow Krause, LLP, and referred to herein as "Baker Tilly"); and Deloitte, LLP ("Deloitte").

## NATURE OF ACTION

1.     Aspirity Holdings, LLC (f/k/a Twin Cities Power Holdings LLC; hereafter, "Aspirity") was a Minnesota energy company that operated from 2006 until entering bankruptcy in June 2017.

2.     For the first several years of its existence, until July 1, 2015, Aspirity (then known as Twin Cities Power Holdings, LLC ("TCPH") operated primarily as an energy trading and investment company.

3.     Aspirity raised most of its operating capital by selling short-term Renewable Unsecured Subordinated Notes ("Notes") to the general public. By year end 2014, Aspirity had

1

nearly $22 million in its trading account, virtually all of which was attributable to its Notes program.

4.      Aspirity transformed its business over the summer of 2015, shifting its focus from energy trading to retail energy.

5.      Aspirity engineered this transformation through what a bankruptcy trustee would later describe as a "convoluted 'restructuring' transaction" through which Aspirity's founder, majority owner, and control person, Timothy Krieger ("Mr. Krieger") "appropriated approximately $22 million in cash and accounts . . . [leaving] behind a fledgling retail energy company that would abruptly fail and a $22 million 'IOU'" to the company's Noteholders that remains unpaid to this day.[1]

6.      Aspirity entered bankruptcy in June 2017. The bankruptcy trustee sued Mr. Krieger for fraud, breach of fiduciary duty, and other misdeeds. Mr. Krieger failed to offer any meaningful explanation as to where the $22 million went—in fact, when deposed he asserted his Fifth Amendment privilege nearly 400 times. He apparently squandered all of the money[2] and eventually entered into a settlement agreement with the trustee for a mere $725,000—a fraction of the debt owed to Noteholders.

7.      Defendants Baker Tilly and Deloitte were Aspirity's auditors during and after the "restructuring."  As forth in more detail below, Baker Tilly and Deloitte were instrumental in helping to both facilitate and conceal Mr. Krieger's misdeeds. On this basis the Plaintiffs, on behalf of themselves and all other individuals who purchased or renewed an Aspirity Note following the

---

[1] Aspirity's downfall—and its Noteholders' losses—have been well-publicized in the local media *See, e.g.*, https://www.startribune.com/investors-out-30m-as-hard-charging-commodities-trader-files-for-bankruptcy/444744873/.

[2] Aspirity's bankruptcy Trustee informed the Noteholders that Krieger had supplied a confidential personal financial statement showing that he had few remaining assets such that a judgment on the Trustee's $18 million claim "would in all likelihood be nearly impossible to collect."

Restructuring, bring claims against Baker Tilly and Deloitte for negligent misrepresentation, aiding and abetting fraud, and aiding and abetting Mr. Krieger's breaches of fiduciary duty.

## PARTIES

8.     Plaintiff K. Tausif Kamal is, and was at all times mentioned herein, an individual citizen of the State of Texas, and currently resides in that state. He purchased and renewed Aspirity Notes during the class period defined *infra*.

9.     Plaintiff Samuel Edison is, and was at all times mentioned herein, an individual citizen of the State of California, and currently resides in that state. He purchased and renewed Aspirity Notes during the class period defined *infra*.

10.     Defendant Baker Tilly US, LLP, formerly known as Baker Tilly Virchow Krause, LLP, is a corporation organized under the laws of the State of Delaware, with its principal place of business also located at 1301 W 22nd St. Suite 400 Oak Brook, IL 60523.

11.     Baker Tilly served as Aspirity's independent auditor from at least 2015 until on or around April 15, 2016.

12.     Defendant Deloitte, LLP ("Deloitte") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 30 Rockefeller Plaza, New York, NY 10112.

13.     Deloitte served as Aspirity's independent auditor from on or around April 15, 2016, until at least May 2017 or later.

14.     Where appropriate, Baker Tilly and Deloitte are sometimes referred to herein as "Defendants" or the "Auditors."

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), codified at 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interest and costs, and there is diversity between at least one Plaintiff and one Defendant.

16.     This Court has personal jurisdiction over Baker Tilly and Deloitte.

17.      Baker Tilly has two Minnesota offices located at 225 South 6th St, Minneapolis, MN 55402, and 380 Jackson St. Suite 300 Saint Paul, MN 55101. All work that Baker Tilly performed in its role as Aspirity's auditor was performed at these offices, and/or at Aspirity's offices at 16233 Kenyon Avenue, Suite 210, Lakeville, MN 5504 and/or 701 Xenia Avenue, Suite 475, Minneapolis, MN 55416.

18.     Deloitte has a Minnesota office located at 50 South 6th St. Suite 2800, Minneapolis, MN 55402. All work that Deloitte performed in its role as Aspirity's auditor was performed at this office, and/or at Aspirity's offices at 16233 Kenyon Avenue, Suite 210, Lakeville, MN 5504 and/or 701 Xenia Avenue, Suite 475, Minneapolis, MN 55416.

19.     The Auditors availed themselves of this forum through their dealings with Aspirity that give rise to the instant lawsuit. The negligent acts described in this Complaint occurred entirely within the State of Minnesota, materially overstating the assets of a Minnesota company for the ultimate benefit of a Minnesota resident, resulting in harm to investors around the country.

20.     Defendants also have fully staffed offices within Minnesota and offer auditing services to Minnesota companies, both of which require them to maintain continuous and systematic contacts such that they could be considered "at home" within the State.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because "a substantial part of the events or omissions giving rise to the claim occurred" within Minnesota. 28 U.S. Code § 1391(b)(2).

## FACTUAL ALLEGATIONS

### Background

22.     On July 13, 2006, Minnesota resident Timothy Krieger incorporated Twin Cities Power, LLC ("TCPH") in Minnesota. TCPH would eventually restructure into Aspirity.

23.     TCPH was a holding company for various subsidiaries—all Minnesota companies—that operated across three primary business segments: wholesale trading, retail energy services, and diversified investments.

24.     On February 10, 2012, TCPH registered with the United States Securities and Exchange Commission ("SEC") and started offering Renewable Unsecured Subordinated Notes (previously defined as "Notes") for sale to the public.

25.     These Notes were sold in varying increments, ranging from as little as $1,000 to $100,000 or more, and for terms between three months and 10 years.

26.     Over time the Note program became the TCPH's primary source of revenue. Hundreds of investors purchased and renewed Notes from 2012 to 2017, often at a pace of $1 million a month or more. During this time TCPH's, and later Aspirity's, outstanding balance owed on the Notes was typically between $20 million and $30 million at any given time.

27.     In the spring of 2015 TCPH began preparing for a "restructuring transaction" whereby TCPH would rebrand as "Aspirity Holdings," focused solely on the retail energy business, *i.e.*, selling electricity to homeowners (hereafter, the "Restructuring").

28.     Prior to the Restructuring the vast majority of TCPH's operating revenue was realized through its energy trading subsidiaries ("Legacy Businesses").

29.     TCPH's Legacy Businesses were to be totally divested as part of the Restructuring, with ownership transferred to a newly-formed entity—the aptly named "Krieger Enterprises."

30.     Aspirity would serve as the interim owner of Krieger Enterprises, with control of Enterprises to be transferred to Timothy Krieger in his individual capacity soon thereafter.

31.     After the Restructuring Aspirity would continue to sell Notes.

32.     Additionally, Aspirity assumed more than $20 million in outstanding Note debt owed by former TCPH.

33.     The retail energy business that would become Aspirity's sole focus was a startup endeavor that would take time to develop into something profitable, leaving Aspirity with no meaningful ability to repay the outstanding Note debt assumed through the Restructuring.

34.     To offset this debt on Aspirity's books, the company arranged to classify the assumption of debt as a "loan" to Krieger Enterprises (hereafter, the "Krieger Loan" or the "Term Loan"). That "loan" would be repaid in variable installments on an as-needed basis determined by the amount of Note redemptions over the relevant time period, with a maturity date of December 30, 2019.

35.     Krieger Enterprises would repay the $22 million using assets belonging to, and revenues generated by, the supposedly profitable energy trading subsidiaries that were being transferred to Krieger Enterprises through the Restructuring. As a safety net, the "loan" was to be guaranteed by the energy trading subsidiaries.

36.     The Restructuring required the approval of a majority of TCPH's Noteholders. In June 2015 a proposal was submitted to the Noteholders asking them to vote on the transaction.

37.    The Restructuring was pitched to as a way to ensure the financial stability of the restructured enterprise by protecting the new holding company and its key subsidiaries from market volatility on the one hand, while ensuring that the cash and revenues from the Legacy Businesses would remain available to pay the principal and interest owed on outstanding Notes, on the other hand.

38.    Aspirity would be a public company, just as TCPH had been, with auditors ensuring that its financial statements were presented fairly in accordance with generally accepted accounting principles.

39.    On these bases the Noteholders voted to approve the Restructuring, and the $22 million Krieger Loan closed on July 1, 2015. On July 1, 2015, Aspirity filed a Form 8-K announcing that the Restructuring had been approved and that Aspirity's assumption of TCPH's outstanding Note debt would be categorized as a "Loan" on Aspirity's books:

> As part of the reorganization, Aspirity Financial entered into a Term Loan Agreement (the "Term Loan") with Krieger Enterprises. Pursuant to the Term Loan, the Company agreed to loan Krieger Enterprises an aggregate principal amount of $22,205,612.86, with a weighted average interest rate of 14.08%. The maturity date of the Term Loan is December 30, 2019.
>
> The purpose of the Term Loan is to establish the principle that the financial operations of the Legacy Businesses will be devoted to support the Company's Renewable Unsecured Subordinated Notes (the "Notes"). Accordingly, the monthly repayment schedule of the Term Loan reflects the maximum possible redemptions of the Notes in such month, the outstanding principal amount of the Notes on July 1, 2015, and the weighted average interest rate of such Notes, subject to monthly true-ups, and a portion of the costs incurred by the Company as a public reporting company. The equity of Krieger Enterprises has been pledged to Aspirity Financial to secure repayment of the Term Loan.

40.    Baker Tilly was Aspirity's auditor when the 8-K describing the "Loan" was filed.

41.    Aspirity's management and internal auditors were keen to label the Krieger Loan as a legitimate, collectable—and most importantly, revenue-neutral—transaction; however, the

presentation of the "Loan" in the 8-K was incomplete. This was not a conventional loan. Aspirity was assuming $20 million or more in Noteholder debt and relying upon Krieger Enterprises to fund Aspirity's repayment of that debt on a variable basis as obligations came due. Moreover, Aspirity was relying on Krieger Enterprises to do this without any visibility into its operations or financials.

42.     At all relevant times hereto, Wiley Sharp served as Aspirity's Chief Financial Officer.

43.     In connection with the restructuring, Mr. Sharp was made aware by Aspirity's advisors that "disclosures in 10-Qs and 10-Ks" needed to "provide investors" (who at all relevant times hereto included and in fact consisted almost entirely of Noteholders) with a "discussion of liquidity, capital resources, results of operations, and other information necessary to an understanding of Aspirity's financial condition," including Krieger Enterprises' ability to service the Term Loan.

44.     In July 2015 Mr. Sharp authored a memorandum to Baker Tilly in which he explained Aspirity's plans for the restructuring as set forth above.

45.     As Mr. Sharp explained, the ultimate goal was to increase investment dollars from the public by presenting the company as a retail energy business with a more "predictable earnings stream" than that offered by the energy trading business. Part of this process, Mr. Sharp's memorandum explained, was isolating the Note debt from the retail energy businesses through the "Term Loan" arrangement.

46.     Mr. Sharp's memorandum made clear to Baker Tilly that public investors— including Noteholders—would review Aspirity's presentation of the Term Loan.

47.     On August 7, 2015, Baker Tilly's audit partner James Nowoswiat responded to Mr. Sharp's memorandum. That response recognized that Krieger Enterprises would in effect be the guarantor of the Noteholder debt. As Mr. Nowoswiat later reiterated, from an accounting perspective Aspirity was "totally dependent upon the operations of Enterprises on day 1."

48.     Mr. Sharp was sensitive to including Krieger Enterprises in Aspirity's financials, either on a consolidated basis or otherwise.

49.     Throughout July and August 2015 Mr. Sharp had numerous phone calls and email exchanges with Baker Tilly, including Mr. Nowoswiat, regarding the presentation of Krieger Enterprises' financials to investors.  Through these exchanges Baker Tilly was made aware that Noteholders would rely on Baker's Tilly's opinions regarding, *inter alia*, Krieger Enterprises' ability to service the Term Loan, which in turn would satisfy the Note obligations. In response, Baker Tilly made clear its view that Krieger Enterprises' financials would need to be consolidated with Aspirity's.

50.     Simply put, as one of Aspirity's advisors put it, there was a "benefit to investors in seeing how much credit risk Aspirity is exposed to through its loan to KE [Krieger Enterprises], especially in the short term where Aspirity is relying heavily on KE making its loan payments to fund Aspirity's existing obligations because Aspirity doesn't have operating revenue. Providing investors some visibility to KE financials is helpful for that purpose."

51.     The fact that the Noteholders relied on the auditors' guidance in this regard was readily foreseeable. Much of Aspirity's revenue came from the sale, and more often, the renewal of Notes held by approximately 800 investors—a group that remained largely consistent for years. Aspirity's financials were the only window these investors had into the Company's performance.

The company's auditors were acutely aware of the amount of outstanding Note debt, and the rate at which it was renewed, as both of these metrics were included in the Company's financials.

52.     Through these discussions Mr. Sharp was informed that relying on the income generated from Krieger Enterprises' operations to demonstrate the ability to repay the loan was unworkable from an accounting standpoint. This, in turn, jeopardized the viability of the entire Restructured enterprise, the success of which depended upon convincing the public that the Note debt was likely to be repaid.

53.     Unable to rely solely on Krieger Enterprises' revenue as a basis to prove its financial wherewithal, Aspirity came up with "Plan B": manufacture better financials for Krieger Enterprises.

54.     Aspirity, at Mr. Krieger's direction, accomplished this by engineering a straw transaction whereby two of TCPH's subsidiaries were sold to Mr. Krieger's childhood friend, Mike Angell.

55.     According to Mr. Angell, the two subsidiaries were on the precipice of bankruptcy, yet nonetheless he bought them for a $20 million, despite having no experience whatsoever in the energy trading industry.

56.     A $500,000 down payment was ostensibly required as part of the purchase, but was never paid.

57.     TCPH extended nearly all of the entire $20 million purchase price on credit. An accountant for TCPH later stated that she was unaware of any due diligence performed prior to the sale.

58.     As a result, TCPH received a $20 million payable—an asset—on its books that was almost immediately thereafter transferred to Krieger Enterprises as part of the Restructuring.

(Hereafter, the $20 million note payable by Mr. Angell to Krieger Enterprises is referred to as the "Angell Note".)

59.     A "Restructuring Plan" drafted by Mr. Sharp contemporaneously with the Restructuring acknowledges that the Angell Note "needs to be supportable," as it was integral to the "final structure of KE's debt" insofar as it would be used as a balance sheet offset to Krieger Enterprises' liability on the Term Loan.

60.     The Angell Note had the effect of artificially inflating Krieger Enterprises' financials, giving the appearance Krieger Enterprises had resources far in excess of reality and providing false assurances that Krieger Enterprises was able to support the Term Loan.

61.     The result was that immediately upon the consummation of the Restructuring, Aspirity's true financial position was not accurately presented to its investors, including Plaintiffs and the other Noteholders, from either a quantitative or a qualitative standpoint.

62.     In reality, restructured Aspirity was cash strapped and solely dependent upon future operations to generate revenue—the very condition Mr. Nowoswiat and others had warned was not sustainable from an accounting perspective.

63.     Aspirity was able to limp along until June 2017, largely because the vast majority of its Noteholders, oblivious to Aspirity's true condition, continued to renew their Notes. Krieger Enterprises' ability to service the Note debt was thus never put to the test—at least until November 2016, as set forth in more detail below.

<u>Misappropriation and Mismanagement Behind the Scenes</u>

64.     Six months prior to the Restructuring, TCPH reported cash deposits of approximately $25 million. Having this cash on hand was crucial to the company's financial health, as the energy business can be volatile and this cash (i) ensured the company could meet

redemption obligations on upcoming short-term Note payments while (ii) still possessing sufficient operating capital to participate in the energy trading transactions that were the core of the company's business.

65.    By the end of 2015 that $25 million in cash had dropped to just $10 million.

66.    The Trustee appointed in connection with Aspirity's bankruptcy proceedings determined that Krieger withdrew nearly $6 million from Krieger Enterprises in 2015; nearly $11 million in 2016; and just over $2.7 million through the first half of 2017. These amounts would have been sufficient to repay the so-called "Term Loan" almost in full.

67.    Bank records reviewed by the Trustee showed that Krieger transferred much of this money into his personal bank account and used another $1 million to purchase a home for himself. During a Rule 2004 examination conducted in connection with the bankruptcy Krieger invoked the Fifth Amendment privilege nearly 400 times.

68.    In addition to the foregoing, Krieger Enterprises suffered substantial operating losses during this same time period, losing $4.6 million in 2015; $8.1 million in 2016, and $6 million in 2017.

69.    In 2015, Krieger Enterprises' financials were consolidated with Aspirity's, and were artificially inflated by the phantom Angell Note. As set forth in more detail below, Aspirity's auditor at the time, Baker Tilly, had actual knowledge of certain red flags calling into question the legitimacy/collectability of that Note, yet never acted upon them.

70.    By the first quarter of 2016, Aspirity no longer consolidated Krieger Enterprises' financials. Classification of the Term Loan as a payable should have drawn increased scrutiny at this point; however, and also as set forth in more detail below, the Company's auditor—now

Deloitte—blindly co-signed Aspirity's untested assertions that Krieger Enterprises' operations were sufficient to support repayment.

71.     Eventually the shoe dropped and it was revealed that Krieger Enterprises lacked the ability to repay the Term Loan. This had been the linchpin of Aspirity's supposed solvency—absent the offsetting Term Loan, Aspirity was faced with $20 million or more in Noteholder obligations that it had no chance of satisfying. Soon thereafter Aspirity found itself in bankruptcy in this Court before the Hon. Judge Sanberg beginning in June 2017.[3]

72.     At all relevant times hereto Aspirity was insolvent as its liabilities were greater than its assets, exacerbated by the fact that the company was suffering significant operating losses each year and its cash flows were evaporating.

<u>The Auditors</u>

73.     Aspirity was a public company required to file reports with the SEC. These reports, including but not limited to quarterly reports (Form 10-Q) and annual reports (Form 10-K), presented Aspirity's balance sheets and other financial data. Material financial events were reported on Form 8-K.

74.     Defendants were Aspirity's auditors following the Restructuring Transaction. In this capacity Defendants performed reviews/audits of Aspirity's financials in accordance with the auditing standards set forth by the PCAOB.

75.     The Auditors—Baker Tilly and later, Deloitte—were integrally involved in the perpetuation of Aspirity's artifice.

---

[3] Aspirity's wholly-owned subsidiary, "Aspirity Energy, LLC" filed a Chapter 7 petition in June 2017. *See* No. 4:17-bk-41991 (Bankr. D. Minn.). Aspirity was placed into involuntary bankruptcy in March 2018. *See* No. 4:18-bk-40667 (Bankr. D. Minn.)

76.    Applicable auditing standards impose requirements to evaluate the collectability of assets, whether between related parties or not. Both auditors negligently performed their charge, allowing Krieger to systematically loot nearly $20 million in Noteholder value out from under the auditors' figurative noses.

77.    The Auditors' failures manifested in the form of public statements and other guidance that both misrepresented and omitted key facts, incorrectly portraying Aspirity as financially stable. These statements began with the first quarterly report issued after the Restructuring and continued throughout the end of 2016.

78.    Investors relied on Aspirity's and the Auditors' presentation of qualitative and quantitative financial information in Aspirity's public filings in making their investment decisions. This reliance was acknowledged in Aspirity's annual reports that were signed by the Auditors.

79.    The Auditors breached the standard of care required of them, resulting in and perpetuating the material misstatement of Aspirity's financials and other key information as set forth below.

*Baker Tilly*

80.    Both Baker Tilly and Deloitte had substantial involvement in the preparation of Aspirity's quarterly reports, providing accounting guidance, and in many instances specific language, that was included in those reports and ultimately disseminated to investors.

81.    As Mr. Sharp acknowledged in a memorandum he sent to Baker Tilly, Deloitte, and others in late February 2016, Aspirity's "normal practice" was to distribute draft quarterly filings to its auditors well in advance of filing. Upon receipt the auditors would perform field work and provide guidance in the form of comments on both the presentation of financials and analysis appearing in the reports. These comments included specific accounting directives—how things

14

should be presented in the interim financials—as well as substantive prose explaining relevant accounting matters.

82.     For example, on or about August 7, 2015, in advance of the issuance of the 10-Q for the second quarter of 2015, Baker Tilly issued a memorandum to Aspirity providing a list of "warning indicators" about the Restructuring. These red flags highlighted the thinly capitalized/highly leveraged borrowers on the payment side, focusing on Angell's lack of liquidity and Krieger Enterprises' insufficient capital.

83.     Consistent therewith, a Baker Tilly representative (possibly Mr. Nowoswiat, Bhayneet Baiway, and/or Jon Leonard) advised Aspirity via telephone on August 7, 2015 that the company could not book the entire amount of the Angell Note as an asset effective immediately as there was not a reasonable assurance of collection under applicable accounting standards.

84.     Baker Tilly's initial skepticism was well-taken. At that point Angell had not made the $500,000 down payment required of him (it is unclear whether he ever made it), and he ultimately made perhaps one or two payments on the Note—likely using money that Mr. Krieger had advanced to him to avoid a default.  Angell ultimately defaulted on the Note in late 2015 and/or early 2016.

85.     Notwithstanding the foregoing, however, during that same August 7 call Baker Tilly advised Aspirity that Enterprises could book the receivable from the Angell Note as a deferred gain in its 10-Q for the second quarter of 2015. As a result, Aspirity's investors, including Plaintiffs and the other Noteholders, saw the nearly $20 million Angell Note appearing in the asset column in Krieger Enterprises' books.

86.     The Angell Note was presented similarly in Aspirity's 10-Qs for the remainder of 2015 and the first quarter of 2016, notwithstanding Angell's failure to make payments as required.

87.     Baker Tilly's involvement in 10-Qs was not limited to issues related to the Angell Note.

88.     On August 12, 2015, Mr. Nowoswiat provided Aspirity with specific language to include in its 10-Q for the second quarter of 2015 regarding "material weaknesses" in the Company's presentation of its financials, namely, "[a] control deficiency regarding ineffective controls over accounting and financial disclosures associated with accounting and reporting complex and unusual transactions." For reasons not yet known, Aspirity's audit committee failed to include that language.

89.     Perhaps due to this deficiency, Aspirity's 10-Q for the third quarter of 2015, *i.e.* the three-month period immediately following the Restructuring Transaction and the closing of the Krieger Loan, presented the Loan as an "intercompany relationship" that, although eliminated in consolidation, "was constructed on an arm's length basis, contains customary protective provisions for the lender including certain guarantees, collateral, and covenants, and ensures that the cash flows generated by the Legacy Businesses may continue to be used to pay the interest and principal on the outstanding notes."

90.     This statement was incorrect. The Krieger Loan was not an arms' length transaction. It was engineered by Timothy Krieger on both sides of the deal to provide himself with a way to turn TCPH's energy trading businesses into his personal piggy bank. Critically, the supposed "guarantees" promised in the 10-Q were never executed in writing.

91.     Around this same time, Aspirity was embroiled in a dispute with Mr. Nowoswiat regarding the continuing need to present Krieger Enterprises' financials in its quarterly and annual reports. Mr. Sharp was adamant that Krieger Enterprises should be kept off of the books, even enlisting a second "informal" or "off-the-record" opinion from Deloitte, whose partner, Patrick

Larson, provided guidance intended to help Aspirity convince Baker Tilly that Krieger Enterprises did not need to be presented.

92.     Aspirity enjoyed working with Deloitte, to the point that Aspirity decided to replace Baker Tilly with Deloitte in February 2016.

93.     Aspirity filed a Form 8-K announcing the change. That Form 8-K included a statement that there were no disagreements between the Company and Baker Tilly other than the "deferred gain" on the Angell Note discussed above that was subsequently resolved. There was no mention of the material weakness issue, nor was there any mention of the overarching collectability issues regarding the Angell Note.

94.     Baker Tilly signed a letter certifying Aspirity's statement in the 8-K.

95.     To maintain continuity, it was decided that Baker Tilly would complete Aspirity's 2015 year end audit.

96.     Early drafts of Baker Tilly's audit report for 2015 recited that Baker Tilly "identified conditions or events indicating a substantial doubt about the Company's ability to continue as a going concern for a reasonable period of time, including: [t]he Company has reported net loss for the year ended December 31, 2015[;] [t]he Company has a working capital deficit as of December 31, 2015[;] [t]he Company had an accumulated deficit as of December 31, 2015 [and] The Company has included a disclosure regarding liquidity and the Company's need to raise additional funds to support operations through December 31, 2016."

97.     These concerns were eliminated from later drafts of the report, which stated only that "[w]e will be reviewing management's plans with regards to the entity's ability to continue as a going concern."

98.     The same audit report also noted that Baker Tilly had encountered difficulties and/or points of contention with Aspirity regarding the accounting for Angell Note; the presentation of Krieger Enterprises' financials, and the going concern qualification noted above.

99.     On April 15, 2016 Aspirity's 10-K for year end 2015 was released.

100.    None of Baker Tilly's concerns referenced above was disclosed in that 10-K.

101.    Additionally, the 10-K presented the Term Loan as an asset on Aspirity's books, with a corresponding liability owed by Krieger Enterprises, that netted out in consolidation to create a revenue-neutral transaction. This was incorrect.

102.    Numerous red flags called into question the ability of Krieger Enterprises to repay the Krieger Loan—chief among them, the fact that $22 million was being "loaned" to Aspirity's controlling shareholder. Whether eliminated in consolidation or not, this was a classic related party transaction requiring specific analysis of the financial capabilities of the related party. *See* AS 2410: Related Parties.

103.    Additionally, Krieger Enterprise's largest receivable – the $20 million Angell Note payable by Krieger's childhood friend, Mike Angell, in exchange for the transfer of two virtually worthless TCPH subsidiaries—went into default almost as soon as it was issued. Upon information and belief, Angell never made a single payment on that note. The failure to take action to collect on a $20 million payable should have drawn the Auditors' scrutiny, had they been paying attention. *See* AS 2301: The Auditor's Responses to the Risks of Material Misstatement.

104.    Baker Tilly had an independent duty to evaluate the risks associated with a "significant unusual transaction" like the Krieger Loan. *Id.* In particular Baker Tilly should have evaluated whether that supposed "Loan" was truly arms' length and collectable, exercise "professional skepticism" in its analysis. *Id.*

105.    These duties were further heightened by magnitude of the Restructuring Transaction, which divested Aspirity of all of its revenue-generating assets and left the Company solely reliant upon the newly-created Krieger Enterprises to fund repayment of more than \$20 million in assumed Note obligations, imposed heightened duties of review upon Baker Tilly effective immediately upon the consummation of the Loan. *See* PCAOB Auditing Standard ("AS") 2301.

106.    As noted earlier, Aspirity openly acknowledged that it was entirely dependent upon repayment of the Krieger Loan to satisfy its own obligations to Noteholders. Under these circumstances AS 1101 imposed a heightened duty to minimize "detection risk," *i.e.,* the risk that the procedures performed will not detect a material misstatement, where, as here the risk of a misstatement is heightened. In other words, the greater the risk, the greater the burden on the Auditors to implement processes that will minimize the risk of a misstatement.

107.    Importantly, these duties exist even for interim reports. *See* AS 4105: Reviews of Interim Financial Information. In this context Auditors should read the proposed interim report to identify potential misstatement issues and perform analytical procedures to assess those issues informed by specific knowledge of the client's business, with an eye toward determining whether the Krieger Loan was "conducted on terms equivalent to those prevailing in an arm's-length transaction." *Id.* The auditor's assessment of risk, circumstances that create incentive to misstate financials, and the nature of the account or disclosure all inform the scope of this review. *Id.* These duties were heightened in light of the fact that Krieger Enterprises was hemorrhaging cash during the second half of 2015, and that Tom Krieger was withdrawing large chunks of the cash that was available for himself. As the Auditor for the consolidated Aspirity companies, Baker Tilly had access to and thus constructive knowledge (if not actual knowledge) of this information.

108.    Baker Tilly was aware from its conversations and correspondence with Mr. Sharp in the early stages of the Restructuring that investors relied on Aspirity's public statements in making investment decisions.

109.    It was readily foreseeable that known and existing Noteholders who faithfully renewed their short-term Notes were relying on this information—in fact, it was the Noteholders' only source of information regarding their investments. The "Risk Factor" section in the 10-K acknowledged that "purchasers of our Notes" relied on the Company's financial information to make their investment decisions.

110.    Notwithstanding the foregoing—and in spite of its awareness of issues with the Angell Note— Baker Tilly failed to apply the required procedures described above for evaluating the presentation of the Krieger Loan. *See, e.g.*, AS 2410; 2301; 4105, *supra*.  This evaluation would have revealed that the Loan was not a revenue-neutral transaction for Aspirity but was instead a liability (due to the assumption of outstanding note obligations without adequate evidence of repayment) or, at a minimum, a contra-asset on account of the significant collectability concerns discussed herein.

111.    Instead, Baker Tilly simply rubber-stamped Aspirity management's presentation of the Loan as a collectable related party transaction that was appropriately eliminated in consolidation.

112.    Baker Tilly's neglect of its duties caused it to supply incorrect guidance in Aspirity's quarterly filings for the second and third quarters in 2015, and in its annual report for YE 2015. In all of these filings the Term Loan was depicted as a collectable asset; a revenue neutral transaction. As noted above, this was incorrect.

113.    The 2015 annual report falsely presented the Term Loan as a collectable asset that netted out Aspirity's obligations on the Notes. Against this backdrop Baker Tilly should not have certified that Aspirity's consolidated financial statements fairly presented the company's financial position as of year-end 2015.

114.    The 2015 annual report should have included the going concern qualification that Baker Tilly originally concluded was warranted.

115.    Baker Tilly's failures to assess the presentation of the Krieger Loan in the 2015 10-K is even more damning in light of Aspirity's warning in Item 1-A that its internal controls over its financial reporting were not effective. In other words, Aspirity acknowledged that its own pronouncements could not be trusted.

116.    Baker Tilly's neglect is further underscored by the fact that during the second half of 2015, Aspirity consolidated Krieger Enterprises as a variable interest entity. As such, Baker Tilly had ready access to Krieger Enterprises' financials and could have analyzed those financials to determine that the Krieger Loan was not properly presented as a revenue-neutral transaction suitable for elimination in consolidation.

117.    Consistent therewith, on November 6, 2015 Baker Tilly had provided its annual "audit plan" to Aspirity setting forth specific areas of emphasis for the 2015 audit. One of the items Baker Tilly promised was to "express an opinion on the consolidated financial statements of Krieger Enterprises."

118.    That same audit plan identified "consideration of fraud risk" as a "significant risk."

119.    The express commitments specified in the audit plan required Baker Tilly to evaluate the Term Loan in accordance with the principles identified above. Baker Tilly failed to do so; if it had it would necessarily have been required to discuss with Aspirity's internal audit

committee that the Loan should have been reclassified as a liability and/or contra asset. If the committee refused, additional measures, including corrective disclosures and/or reference to regulators, would have followed. *See, e.g.*, AS 2905; AS 2401.

120.   Baker Tilly chose not to do any of the foregoing, and because of Baker Tilly's neglect, Aspirity's financials were artificially inflated as of the inception of the Term Loan.

121.   As a result of Baker Tilly's actions and omissions, Plaintiffs and other Noteholders were prevented from discovering that Aspirity was insolvent, and that they were purchasing Notes from a company whose auditor had not performed adequate analysis to determine – and in fact did not believe – that the Company would be able to repay those Notes.

122.   These Noteholders purchased Notes due to Baker Tilly's acts and omissions persisted throughout the second half of 2015 and beyond, often at a rate of $1 million a month or more.

123.   During this same time frame Krieger Enterprise's cash decreased by millions of dollars, much of which went into Krieger's pockets.

*Deloitte*

124.   Although it had done informal consulting work for Aspirity since July 2015, in February 2016 Aspirity's Board of Directors officially confirmed that Deloitte would serve as Aspirity's new auditor, beginning with the Q1 2016 10-Q.

125.   Before accepting a new engagement, incoming auditors are required to communicate with the prior auditor to discuss, *inter alia*, information that may bear on the integrity of management; disagreements as to accounting principles, auditing procedures, or other significant matters; possible issues regarding fraud or internal control related matters; and transactions with related parties and significant unusual reactions. *See* AS 2610.

126.    Warning signs abounded suggesting that Deloitte should have closely scrutinized Aspirity's financial picture, and in particular its ability to repay the outstanding Note obligations, prior to accepting the engagement.

127.    As noted above, at the close of 2014 TCPH had nearly $25 million in cash accounts, which was transferred to Krieger Enterprises as part of the Restructuring. Only a year later that cash balance had dwindled to only $10 million—a decrease of approximately 60 percent. This alone was sufficient to require Deloitte to review the viability of purported "Loan" in connection with its transition.

128.    Notwithstanding the foregoing, Deloitte accepted the engagement without meaningful inquiry into the Krieger Loan or its characterization as an asset.

129.    Effective in the first quarter of 2016, Aspirity decided that it would no longer consolidate Krieger Enterprises as a variable interest entity. This was a material change from the prior year, where the Krieger Loan had been treated as a related company transaction eliminated in consolidation from Aspirity's balance sheet.

130.    Aspirity disclosed this change in its 10-Q for the first quarter of 2016. In that report Aspirity stated that its management was "of the opinion that Enterprises likely has sufficient liquidity and operating success to service the debt going forward."

131.    Deloitte was now serving as Aspirity's auditor at this time, and thus had a duty to review the information in this interim report. *See, e.g.*, AS 4105.

132.    Deloitte's 2016 client service plan for Aspirity states that Deloitte had identified deconsolidation of Krieger Enterprises as a fraud risk. During this time Mr. Krieger was in fact committing fraud by taking assets from Krieger Enterprises for his personal gain.

133.    The foregoing items should have prompted Deloitte to evaluate the Loan for collectability under AS 2410, which applies to related party transactions disclosed in financial statements and requires the auditor to evaluate the financial capability of the related parties with respect to significant uncollected balances and loan commitments.

134.    At a minimum Deloitte should have evaluated whether the Term Loan, which for the first time was not being eliminated in consolidation, was truly an arms' length transaction with "customary protective provisions" as claimed.

135.    Deloitte also should have evaluated whether Krieger Enterprises—which at this point was now at least $6 million lighter due to Krieger's personal withdrawals, not to mention the operating losses sustained the prior year—was in fact able to satisfy its obligations on the Loan.

136.    In the meantime, investors kept purchasing Notes on the basis of inflated financials hiding the fact that Aspirity had absorbed a $22 million liability.

137.    As noted above, it was Aspirity's "normal practice" to circulate its quarterly reports to its auditors and have them offer substantive guidance that would be incorporated into those reports.

138.    Deloitte partner Patrick Larson was heavily involved in the preparation of Aspirity's quarterly reports.

139.    For example, on March 18, 2016, Mr. Larson instructed Wiley Sharp as to how to present Krieger Enterprises' financials in Aspirity's upcoming quarterly report following the deconsolidation.

140.    In connection with the preparation of Aspirity's quarterly reports, Deloitte would provide Aspirity's audit committee with "draft" reports describing Deloitte's work for the quarter.

141.    The draft Deloitte report dated May 11, 2016, suggests that Deloitte conducted a review of Krieger Enterprises' operations prior to the issuance of the 2016 first quarter report—but apparently did not consider its ability to repay the Term Loan.

142.    That same report discloses that Deloitte identified a number of items that called into question Aspirity's ability to continue as a going concern for a reasonable period of time, including net loss, working capital deficits, and accumulated deficits.

143.    Additionally, in that same report Deloitte identified an issue with how owners' equity in Aspirity should be presented in both the upcoming quarterly report and also whether the prior 10-K needed to be amended.

144.    In connection with this analysis, Deloitte partner Mr. Larson acknowledged that "debt holders would be concerned with the net equity of the Company as a measure of financial position."   Mr. Larson's statement confirms that Deloitte had actual knowledge that Aspirity investors, including Note holders, reviewed and relied upon the financial presentation in the Company's quarterly and annual reports.

145.    In August 2016 Aspirity issued a 10-Q for the second quarter of 2016 stating that "[Krieger] Enterprises likely has sufficient liquidity and operating success to continue to service the debt going forward."

146.    Deloitte reviewed this 10-Q as well. As part of that review Deloitte was required to perform analytical procedures, make inquiries of persons responsible for financial and accounting matters, and where warranted, perform other procedures the accountant considers appropriate to provide a basis for communication material modifications that should be made to the company's interim financials. *See, e.g.*, PCAOB AS 4105. Such reviews are intended to "bring to the accountant's attention significant matters affecting the interim financial information."

147.     Deloitte was aware that investors relied on Aspirity's public statements in making investment decisions, yet failed to apply required procedures for evaluating Aspirity's statements describing the Krieger Loan. These required procedures included, but were not limited to, evaluating the collectability of the Krieger Loan; Krieger Enterprises' use of cash ostensibly intended to repay the Loan; and testing to gauge whether the promised guarantees were actually in place as represented. *See, e.g.*, PCAOB AS 2410.

148.     In short, Deloitte made no inquiry to assess Aspirity's true financial condition as of the date of the second quarter 2016 10-Q.

149.     Beyond that, Deloitte's quarterly report again reflected its doubts about Aspirity's ability to continue as a going concern—a concern that was not disclosed in the 10-Q.

150.     On this basis the 10-Q for the second quarter of 2016, which included statements and other guidance furnished by Deloitte, improperly presented the Term Loan as a valid and collectable receivable—a $20 million asset—and was disseminated to investors.

151.     Had Deloitte performed any meaningful audit processes it would have determined that the statements made in the 10-Q concerning Krieger Enterprise's repayment abilities were false and that the Krieger Loan was not properly booked as an asset. Even a cursory review of Krieger Enterprise's financials would have revealed that the entity was (i) losing money, and (ii) Krieger was withdrawing whatever remained.

152.     Indeed, at that very same point in time Timothy Krieger was working to renegotiate repayment of the Loan due to his inability to continue making the variable payments dictated by recent Note redemptions as required under the original loan documents.

153.    Very soon thereafter, effective November 1, 2016, Aspirity and Krieger Enterprises amended the Term Loan agreement to implement a fixed monthly payment schedule that Krieger believed would give him the ability to service his debt to Aspirity, at least temporarily.

154.    On November 10, 2016, Aspirity drafted a memorandum to Deloitte and others discussing accounting treatment of the Term Loan following the amendment. Patrick Larson of Deloitte commented on that memorandum, questioning, *inter alia*, whether it would impact categorization as an "asset vs. equity."

155.    Aspirity's 10-Q for the third quarter of 2016 was released just a few days after that amendment was executed. Although that 10-Q discussed the amendment as a "Subsequent Event," Deloitte failed to undertake the required review of the consequences of that amendment, and in particular to determine whether those consequences required corrective action to remedy any of the statements contained in the 10-Q—or whether the amendment impacted Aspirity's ability to continue as a going concern. Deloitte was required to make inquiry as to both of these possibilities under AS 2301, 2410 and 4105.

156.    Aspirity's true financial condition was therefore yet again concealed for the next several months.

157.    On the same date that the 10-Q for the third quarter of 2016 was released, Aspirity issued a press release discussing the "accounting treatment" of the Term Loan following the amendment.

158.    Deloitte's Patrick Larson provided comments on that Press Release before it was issued, including comments on the discussion of assets on the Company's balance sheet for the quarter. One of Mr. Larson's comments suggested including language to make sure risks were

made "clear to the readers and debt investors"—again recognizing Deloitte's actual awareness that investors relied on the accounting guidance that Deloitte provided.

159.    On November 19, 2016, Aspirity's audit committee held a meeting at which Patrick Larson was present.  During that meeting they discussed the "upcoming going concern disclosure in the annual filing at year end."  This information, though known, had not been disclosed to investors in the 10-Q, which again recited that "the Company believes that payments from Enterprises on the Term Loan, anticipated cash generated from operating activities, availability of trade credit with respect to power purchases, and anticipated proceeds from our Notes Offering will be sufficient to meet operating cash requirements and obligations under the Notes for the next twelve months."

160.    All the while Aspirity Notes continued to fly off the shelves. Nearly $1.8 million in Notes were sold in the five-week span leaning up to the filing of the 10-Q for the third quarter of 2015. Notes continued to sell at or around this pace until March 2017.

161.    In early 2017 Deloitte began its work on Aspirity's 10-K for year 2016.

162.    On April 28, 2017, Aspirity filed that report with the SEC.

163.    Section 10 of that report, titled "Term Loan Receivable from Related Party," provided as follows:

> In conjunction with the modifications in Amendment 3 [discussed in paragraph 116, *supra*] management evaluated the classification of the Term Loan. Its terms are consistent with those likely available from a third party and there is intention to repay. While the loan is not in default, due to recent losses, the historical volatility of its primary business of wholesale electricity trading, and the level of assets in the business, there is no longer significant evidence of collectability of all amounts owed.
>
> Therefore, effective with the date of the amendment, the **Term Loan is classified on the balance sheet as a receivable from a related party, a contra-equity account**. Subsequent to November 1, 2016, the cost recovery method will be used account for income related to the Term loan. All

> payments received after the amendment were recognized as equity contributions and reductions to the principal of the loan. Under this method, cash receipts are first applied to reduce the principal balance of the receivable and second to income after all principal has been repaid."

(Emphasis added).

164.    In other words, the 2016 10-K as certified by Deloitte reclassified the Term Loan from a payable (which offset Aspirity's assumption of TCPH's outstanding Note obligations) to a contra-equity account – essentially an account with a negative balance.

165.    Because Aspirity was solely dependent upon the Krieger Loan to repay the outstanding Note obligations, this reclassification was akin to adding a nearly $20 million liability to Aspirity's books. This was a death blow to the company, and on this basis, Deloitte qualified the 2016 10-K with the following "going concern" warning:

> The accompanying consolidated financial statements for the year ended December 31, 2016 have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company's recurring losses from operations, members' deficit, and lack of sufficient cash flows to meet its obligations, including repayment of renewable unsecured subordinated notes, and sustain its operations raise substantial doubt about its ability to continue as a going concern. Management's plans concerning these matters are also discussed in Note 1 to the financial statements. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

166.    The 10-K's reference to the November 2016 amendment as the basis for reclassifying the Krieger Loan as a contra-equity account was a red herring. The considerations identified in the 10-K, *i.e.,* ongoing losses and historical volatility, were present from the inception of the Loan. Indeed, Krieger had just renegotiated the monthly payment amount to decrease that amount to something that he believed Krieger Enterprises was able to carry.

167.    In reality, 20+ months of the Auditors' neglect were finally coming to a head. Baker Tilly had rubber-stamped Aspirity's classification of the Krieger Loan as a payable after the

Restructuring, and Deloitte had done the same for the better part of a year. The conditions informing repayment of the Loan had not changed—the 10-K acknowledged that the Loan had not gone into default. This was simply the first time any Auditor undertook to actually evaluate the facts and circumstances giving rise to the transaction and to apply actual audit procedures to evaluate the Loan for collectability.

168.    Indeed, assuming, *arguendo*, that the November 2016 Amendment did in fact require reclassification of the Loan as a contra-equity account "effective with the date of the Amendment" as stated in the 10-K, then Deloitte should have detected that and taken appropriate action no later than November 2016.

169.    Under any metric, the Auditors' acts and omissions allowed Aspirity to misrepresent the Krieger Loan on its books from July 1, 2015, until April 28, 2016, to the detriment of Aspirity's Noteholders, who the Auditors knew relied upon Aspirity's reports to make their investment decisions.

170.    These Noteholders purchased or renewed tens of millions of dollars' worth of Notes during this time period.

<u>The Aftermath</u>

171.    The issuance of the going concern warning in April 2017 effectively foreclosed Aspirity from selling any more Notes going forward, as no reasonable investor would purchase a promissory note from an entity not expected to survive the coming year.

172.    Around this same time Krieger stopped making payments on the so-called "Loan."

173.    Stripped of its only meaningful revenue sources, Aspirity limped along for the next few months before being going into bankruptcy.

174.    Aspirity did not make any payments on Notes following the issuance of the going concern qualification.

175.    All of Aspirity's outstanding Noteholders lost their entire investment as a result of Aspirity's collapse.

176.    The Auditors' dereliction of duty caused these losses by grossly over-inflating Aspirity's balance sheet, giving the company the false appearance of solvency and stability.

177.    If the Auditors had appropriately classified the Krieger Loan for what it was from the outset—an assumption of $22 million' worth of debt without sufficient indicia of repayment, intended to free up cash for Krieger to siphon from the Company—the Noteholders' losses would have been avoided.

<u>The Named Plaintiffs' Experience</u>

178.    Plaintiff K. Tausif Kamal purchased and/or renewed multiple Notes, first from TCPH and later from Aspirity. These purchases include, but are not limited to, a $20,000 Note with a one-year term that was renewed on September 19, 2015, and again on September 19, 2016; and a $40,000 Note with a two-year term purchased on January 22, 2016. All principal and interest owed on these Notes remains outstanding.

179.    Plaintiff Kamal reviewed and relied on the accuracy of the information contained in all of Aspirity's public filings, including but not necessarily limited to the 10-Qs, 8-Ks, and 10-Ks discussed above, in making his investment decisions.

180.    Plaintiff Samuel Edison purchased and/or renewed multiple Notes, including but not necessarily limited to a $5,000 Note with a one-year term purchased on September 19, 2016; a $40,000 Note with a six-month term purchased on October 28, 2016; a $25,000 Note with a one-

year term purchased on March 19, 2017; and a $7,500 Note with a one-year term purchased on

March 31, 2017. All principal and interest owed on these Notes remains outstanding.

181.    Plaintiff Edison reviewed and relied on the accuracy of the information contained

in all of Aspirity's public filings, including but not necessarily limited to the 10-Qs, 8-Ks, and 10-

Ks discussed above, in making his investment decisions.

<u>Class Action Allegations</u>

182.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully

stated herein.

183.    Plaintiffs bring this action individually and on behalf of all other persons similarly

situated (hereinafter referred to as "the Class") pursuant to Federal Rule of Civil Procedure 23.

184.    Plaintiffs propose the following Class definition, subject to amendment as

appropriate:

> All persons who purchased or renewed a Renewable Unsecured
> Subordinated Note issued by Aspirity or TCPH [or any subsidiary or
> affiliate of either of the foregoing] between July 1, 2015, and April 28, 2017
> ("Class Period") and who did not receive the full amount of principal and
> interest payable under the terms of that Note.

185.    Collectively, these persons will be referred to as the "Class" or "Class members."

Plaintiffs represent, and are members of, the Class. Excluded from the Class are Defendants, any

entities in which Defendants have a controlling interest, and Defendants' agents and employees,

and any Judge to whom this action is assigned and any member of such Judge's staff and

immediate family.

186.    Plaintiffs do not know the exact number of members in the Class, but reasonably

believe that Class members number, at a minimum, to be more than 700. The Class can be

identified easily through records maintained by Aspirity and/or third-party entities that facilitated Aspirity's Note sales.

187.    The joinder of all Class members is impracticable due to the number of Class members. Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits and inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class.

188.    Plaintiffs' claims are typical of those of the Class they seek to represent. Plaintiffs and other Class members purchased or renewed Aspirity Notes after Aspirity made the "loan" to Krieger Enterprises. Aspirity was a public company required to be audited by an independent auditor in accordance with the accounting and auditing standards promulgated by the PCAOB. Plaintiffs reasonably relied on the Defendants to faithfully discharge these duties, thus ensuring that Aspirity's financial statements and related information were presented accurately in its public filings and otherwise. All Note purchases or renewals were made in reliance on the accuracy of the same interim and yearly reports filed with the SEC. The negligent acts of the Defendants in performing their audits thus impacted all investors uniformly.

189.    There are well-defined, nearly identical, common questions of law and fact affecting all parties that predominate over questions that may affect individual Class members, including but not limited to the following:

    i.    Whether Baker Tilly and/or Deloitte was required to evaluate Aspirity's accounting treatment of the Krieger Loan at any point during the Class Period, and whether Baker Tilly and/or Deloitte failed to perform the required audit procedures necessary for that evaluation;

    ii.    Whether Baker Tilly and/or Deloitte negligently provided guidance for the benefit of Plaintiffs and other investors, whether appearing in Aspirity's Quarterly Reports, Annual Reports, press releases or otherwise;

    iii.    Whether Baker Tilly's and/or Deloitte's failures provided substantial assistance enabling Aspirity and/or Timothy Krieger to fraudulently portray Aspirity as a solvent and viable enterprise following the Restructuring;

    iv.    Whether Baker Tilly's and/or Deloitte's failures provided substantial assistance enabling Timothy Krieger to breach fiduciary duties owed to Plaintiffs and the Noteholders;

    v.    Whether Baker Tilly and/or Deloitte raised any issues pertaining to the foregoing with Aspirity's internal audit committee;

    vi.    Whether Baker Tilly and/or Deloitte should have withdrawn any of their work and/or resigned from the engagement on account of Aspirity's misclassification of the Term Loan; and

    vii.    Whether Baker Tilly and/or Deloitte breached any other duties owed to Plaintiffs or the Class Members during the Class Period.

190.    As reflected in the above, Plaintiffs' claims are focused on the conduct of the Auditors in connection with public documents filed with the SEC, the effect of which did not vary between class members. Resolution of these common questions will drive the claims of all Class members toward judgment or resolution; they involve a "fatal similarity" for purposes of the claims of all Class members.

191.    For all these reasons, a class action is the superior method for the fair and efficient adjudication of this controversy.

192.    Plaintiffs and members of the Class have been harmed and continue to be harmed by the foregoing and other acts of the Auditors, which harm includes the total loss of their investments.

193.    Plaintiffs seek damages on behalf of themselves and all Class members, including but not limited to return of their investments, with the interest Aspirity represented would be paid, as well as consequential damages in an amount to be proven at trial.

194.    Plaintiffs will fairly and adequately represent and protect the interests of the Class and have no interests which are antagonistic to any member of the Class.

195.    Plaintiffs have retained counsel experienced in handling class action claims involving investment losses caused by a wide variety of misconduct, including misrepresentation of financial information. Plaintiffs' counsel is experienced in prosecuting the claims of investors against auditors and others who have acted inappropriately to cause investment losses.

196.    Class-wide relief is essential to resolve the claims regarding all investors relating to all responsible parties in an equitable, even-handed fashion.

197.    Plaintiffs therefore seeks certification of the Class pursuant to Rules 23(b)(1)(A) and (b)(3).

198.    Plaintiffs seek certification of a Rule 23(b)(1)(A) class. Adjudicating Defendants' liability for the facts and claims alleged here poses a substantial risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendants if a class is not certified.

199.    Plaintiffs seek certification of a Rule 23(b)(3) class. As detailed above, common questions regarding Defendants' conduct predominate over any individual issues, and a class action is superior to the alternative of hundreds of individual cases involving the same core facts and claims addressed to Defendants' conduct.

200.    In the alternative, Plaintiff seeks certification of an "issues" class pursuant to Rule 23(c)(4). This class would incorporate, and allow for the adjudication of, all issues the Court adjudges to be common to members of the class and subclass, such as one or more of the common issues identified by Plaintiffs, *supra*.

## CAUSES OF ACTION

## COUNT 1: NEGLIGENCE
### (including, but not limited to, negligent misrepresentation and/or the negligent supply of information for the guidance of others)

201.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

202.     Aspirity was a public company required to be audited in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB").

203.     Defendants served as Aspirity's auditors from July 1, 2015 until April 2017 or later.

204.     The PCAOB's Accounting Standards required Defendants to, *inter alia*, develop audit responses and procedures to address the risks of material misstatement in Aspirity's public statements. *See, e.g.*, AS 2301. The PCAOB offers specific guidance governing Defendants' responsibilities and procedures in connection with acceptance of the audit engagement, review of interim reports, analysis of material events, and the preparation of annual reports, including but not limited to:

    i.    AS 2301: The Auditor's Responses to the Risks of Material Misstatement, requires the auditor to, *inter alia*, evaluate whether the company's application of significant accounting principles, particularly those related to subjective measures and complex transactions, are indicative of bias that could lead to material misstatement. The auditor **must exercise professional skepticism** in connection with this evaluation.

    ii.    AS 2301 likewise requires a specific response to "risks associated with unusual transactions," which response includes the **requirement to perform further audit procedures** in response to such transactions.

    iii.    AS 2305: Substantive Analytical Procedures, requires an auditor to develop expectations for particular assertions regarding classes of transactions by **identifying and using plausible relationships that are reasonably expected to exist** based on the auditor's understanding of the client and of the industry in which the client operates.

iv.   AS 2410: Related Parties, requires auditors to obtain an understanding of the company's relationships and **transactions with related parties** that may reasonably be expected to affect the risk of material misstatement. This understanding specifically requires the auditor to perform inquiries into the nature of transactions between the company and related parties, and the specific terms and businesses purposes of those transactions. The goal is to identify and assess risks of material misstatement. For all related party transactions disclosed in financial statements, the auditor must review the documentation to determine if the terms are consistent with how the transaction has been represented, and, specifically, to **evaluate the financial capability of the related parties with respect to significant uncollected balances and loan commitments.**

v.   AS 2610: Initial Audits—Communications Between Predecessor and Successor Auditors, imposes duties of communication between the incoming and outgoing auditor to discuss, *inter alia*, auditing procedures and related party transactions. This standard also imposes **responsibility for the incoming auditor to take action** when it becomes aware of information leading it to believe that prior financial statements may require revision.

vi.   AS 2905: Subsequent Discovery of Facts Existing at the Date of the Auditor's Report, requires the auditor to **take action to prevent future reliance** on reports where the auditor becomes aware of information that should have been reflected in the prior report.

vii.   AS 1101 imposes a duty to minimize "detection risk," *i.e.,* the risk that the procedures performed by the auditor will not detect a misstatement that exists and could be material, based on the level of risk of a material misstatement. The higher the risk associated with a misstatement, the lower the detection risk must be. **Heightened evaluation and analysis are thus required where the risk posed by a misstatement is high.**

viii.   AS 1105 provides that the level of **evidence the Auditor must obtain and evaluate is directly correlated with the risk posed by a misstatement**.

ix.   AS 4105: Reviews of Interim Financial Information, fixes the auditor's **duty to communicate material modifications that should be made to interim reports.** The "review" contemplated by this section includes reading the proposed interim reports to identify possible issues, performing analytical procedures (like comparisons) to assess those issues, obtaining sufficient knowledge of the client's business to identify specific risks of material misstatements associated with those issues, reports, and making inquiries of persons responsible for financial and accounting matters to verify the accounting treatment of significant transactions, related party transactions, or other unusual situations. Notably, this **also requires the auditor to obtain information confirming that related party transactions were "conducted on terms equivalent to those prevailing in an arm's-length transaction."**

(All emphases added.)

205.    The Auditors owed duties of care and competence in performing all of these charges. "Due care imposes a professional responsibility on the auditors to follow generally accepted auditing standards and apply generally accepted accounting principles in auditing the financial statements of a client entity." AS 1015: Due Professional Care in the Performance of Work. It was Aspirity's normal practice to have its auditors provide substantive guidance, both quantitative and qualitative, regarding accounting issues discussed in its public filings, whether quarterly, annual, or otherwise.

206.    Aspirity's quarterly and annual reports consistently acknowledged that Aspirity was solely dependent upon repayment of the Krieger Loan in order to satisfy Aspirity's obligations on the Note debt.

207.    Categorization of the Krieger Loan as a payable was thus imperative for Aspirity to maintain any semblance of solvency—without it, Aspirity was $20 million or more in debt with no prospect of repayment.

208.    The Auditors failed to properly evaluate the collectability of the Krieger Loan and negligently provided guidance that falsely portrayed that Loan as collectable, and Aspirity as a viable and solvent enterprise, in connection with Aspirity's quarterly and annual reports, all as set forth in more detail above.

209.    The Auditors had ample opportunity to perform the required analyses, beginning with the execution of the Restructuring that saw Aspirity assume $20 million in debt in what was misrepresented to investors as a revenue-neutral transaction, and continuing through the first quarter of 2017.

210.    In addition to the foregoing breaches, the PCAOB's accountings standards also imposed affirmative duties on the Auditors to take appropriate steps to correct misstatements, including advising Aspirity's internal audit committee to make appropriate corrective disclosures where necessary, and, if they refused to do so, withdrawing their reports and/or notifying regulatory authorities of the misstatements. *See, e.g.*, AS 2905; AS 2401.

211.    Neither Baker Tilly nor Deloitte ever discussed the classification of the Krieger Loan with Aspirity's Board of Directors or Aspirity's internal audit committee. No inquiry was ever made by Baker Tilly or Deloitte to Aspirity's management or audit committee concerning the Transfer.  These failures likewise resulted in the Auditors' negligent provision of qualitative and quantitative accounting guidance in Aspirity's public filings.

212.    Minnesota law recognizes that investors may pursue direct claims against auditors who breach the foregoing duties.

213.    As a company required to file with the SEC, Aspirity's and the Auditors' public statements regarding its financial condition and otherwise were communicated to investors, like Plaintiffs, who relied upon those statements in making their investment decisions.

214.    Consistent therewith, Aspirity's quarterly and/or annual reports acknowledged that investors relied on the information contained therein in deciding whether to purchase or renew Aspirity Notes.

215.    The Auditors reviewed and signed these reports and, on that basis, had actual and constructive knowledge that Noteholders relied on the information contained in those reports to make their investment decisions.

216.    Baker Tilly had actual knowledge that Plaintiffs and other investors relied upon the presentation and disclosure of information pertaining to Krieger Enterprises and the collectability

of the Term Loan by virtue of, *inter alia*, multiple email exchanges and telephone conversations with Aspirity's CFO Wiley Sharp.

217.    Deloitte had actual knowledge that Plaintiffs and other investors relied upon the presentation and disclosure of information pertaining to Krieger Enterprises and the collectability of the Term Loan as evidenced by Deloitte partner Patrick's Larson's written acknowledgments of same in numerous markups of Aspirity's public filings.

218.    The Auditors also had access to, and responsibility for reviewing, Aspirity's balance sheets and cash flow statements reflecting the exact number of outstanding Notes coming up for renewal, as well as the number of Notes purchased during any given period of time. Indeed, Aspirity's reports routinely disclosed the number of Notes sold during the period at issue.

219.    The Auditors owed duties to these known and foreseeable investors to communicate accurate information, and to ensure that any information the Auditors communicated to Aspirity was accurately reflected in Aspirity's financials and other public statements.

220.    Throughout the Class Period the Auditors failed to do any meaningful evaluation and instead conveyed inaccurate information to Aspirity, and ultimately the investing public at large, to the detriment of the Noteholders.

221.    If Defendants had acted with due care, they would have determined that the Krieger Loan was not properly booked as an asset, and that the assumption of the outstanding Note debt thus imperiled Aspirity's ability to continue as a going concern effective immediately upon the Restructuring.

222.    The effect of the Auditors' negligence is that inaccurate financial information about Aspirity was disseminated to the public. This inaccurate information materially inflated Aspirity's balance sheet by $20 million or more, falsely presenting the company as solvent when it was not.

223.    Plaintiffs and other members of the Class read Aspirity's public filings and relied on the accounting and other information pertaining to the Restructuring that those filings did—and did not—contain.  Plaintiffs and other members of the Class reasonably relied on the information contained in Aspirity's reports filed with the SEC.

224.    If the Krieger Loan had been classified correctly from its inception, restructured Aspirity would have been insolvent and Plaintiffs would not have moved forward with their Note purchases or renewals.

225.    The consequences of the Auditors' negligence were material and readily foreseeable. The vast majority of Aspirity's revenue depended upon Note sales. No reasonable investor will purchase a promissory note from an entity not expected to survive as a going concern. Consistent therewith, as soon the Auditors reclassified the Krieger Loan from a "Loan" into a contra-equity account, Aspirity's balance sheet instantly reflected unmanageable liabilities, resulting in the issuance of a going concern warning. Aspirity's Note sales ended immediately thereafter, and repayment on existing Notes likewise stopped immediately. A few months later Aspirity was placed into involuntary bankruptcy.

226.    Defendants' breaches of their duties owed to Plaintiffs and Class members proximately caused harm to Plaintiffs, in the form of investment losses, that would not have occurred if Defendants had competently performed the charges as Auditors.

227.    The Auditors are liable for all losses Plaintiffs sustained as a result of the Auditors' negligence in an amount to be proven at trial.

228.    The harm the Auditors caused is unique to the Plaintiffs and Class Members and does not constitute a derivative injury claim. Indeed, Aspirity benefited from the misclassification as it allowed them stay in business for nearly two years after the Loan and to continue to sell Notes.

## COUNT 2: AIDING AND ABETTING FRAUD

229.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

230.    At all times relevant hereto, Mr. Krieger and Aspirity's management had actual knowledge that Krieger Enterprises' operations were insufficient to support repayment of the Term Loan.

231.    At all times relevant hereto, Mr. Krieger and Aspirity's management had actual knowledge that the Term Loan was not properly treated as an asset on Aspirity's books.

232.    At all times relevant hereto Mr. Krieger and Aspirity's management knew that the assumption of the Note obligations left Aspirity insolvent, and thus unable to sell Notes if the truth were made known.

233.    To conceal the foregoing Mr. Krieger engineered a "straw sale" to his friend Mike Angell to manufacture $20 million in phantom revenue, in the form of the Angell Note, that inflated value of Krieger Enterprises' books such that it appeared that Enterprises could repay the Term Loan.

234.    Mr. Krieger and Aspirity did this to create a false sense of solvency and viability of the Restructured enterprise. This allowed the enterprise to continue operations as usual, including continuing to sell Notes.

235.    To carry out this fraud Mr. Krieger and Aspirity's management concealed other material facts and circumstances showing the Enterprises' true financial picture, including persistent going concern issues raised by the Auditors.

236.    Baker Tilly had actual knowledge that the Angell Note lacked reasonable assurance of collection, and that Krieger Enterprises lacked ability to serve the Term Loan as a result.

237.    Baker Tilly was aware of numerous red flags further calling into question Krieger Enterprises' ability to service the Term Loan, such as the Company's extreme resistance to presenting Krieger Enterprises' financials.

238.    Baker Tilly's guidance, including but not limited to the guidance it supplied concerning the presentation of Krieger Enterprises' financials in 10-Qs for 2Q and 3Q 2015 in spite of the known issues with the Angell Transaction, and its subsequent certification of Aspirity's 10-K for 2015 as fairly presenting the company's financial position, substantially assisted Krieger and Aspirity's fraud. In short, Baker Tilly helped Aspirity conceal the fact that the entire Restructured Enterprise was insolvent.

239.    Deloitte provided substantive guidance to Aspirity concerning its presentation of information in 10-Qs, beginning with Aspirity's 10-Q for the first quarter of 2016.  This guidance included Deloitte audit partner Patrick Larson drafting language inserted directly into 10-Qs ostensibly authored by Aspirity.

240.    In connection with these 10-Qs, Deloitte also provided Aspirity's audit committee with quarterly presentations of information to be incorporated into the upcoming quarterly report.

241.    Each of Deloitte's quarterly presentations in 2016 included a statement of Deloitte's belief of substantial doubt as to Aspirity's ability to continue as a going concern.

242.    In each 10-Q filed for year 2016, Aspirity, with Deloitte's input and blessing, made false statements suggesting that it "believes that payments from Enterprises on the Term Loan, anticipated cash generated from operating activities, availability of trade credit with respect to power purchases, and anticipated proceeds from our Notes Offering will be sufficient to meet operating cash requirements and obligations under the Notes and Term Loan Notes through at least December 31, 2016."

243.    These statements were misleading in light of Deloitte's stated doubts about Aspirity's ability to continue as a going concern.  Aspirity had a duty to disclose this information to make its 10-Qs accurate to the investors, including Plaintiffs, that Aspirity knew relied on its reports in making investment decisions. Aspirity concealed Deloitte's concerns because it allowed Aspirity to continue selling Notes.

244.    Deloitte, which shared drafting responsibilities for portions of the 10-Qs, and in particular had practical oversight responsibility over Aspirity's complex accounting matters, substantially assisted Aspirity's fraud by failing to ensure that the language disseminated to investors was not misleading.

## COUNT 3: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

245.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

246.    Throughout the second half of 2015 and all of 2016, Mr. Krieger used Krieger Enterprises' assets for his own gain.

247.     He was able to do this by exploiting the entity structure he created whereby Krieger Enterprises gained use of Note proceeds and separated itself from the Note obligations, while falsely portraying Krieger Enterprises as an arms' length borrower with the ability to repay the Term Loan to Aspirity.

248.    At all times relevant hereto, Aspirity was balance sheet insolvent insofar as its liabilities—including but not limited to the Note obligations—exceeded its assets.

249.    Mr. Krieger's siphoning of assets intended for creditors like Plaintiffs and the Note Holders was a breach of his fiduciary duty.

250.     Baker Tilly was aware that the Angell Note was not collectable, and that as a result the Term Loan should not have been carried as an asset on Aspirity's books.

251.     Baker Tilly's failure to push the issue with Aspirity in connection with the issuance of the 10-Qs; its further certification in the 10-K that the Loan was properly presented as an asset of Aspirity's; and its failure to include a going concern warning in the 2015 10-K all substantially assisted Krieger's breach of fiduciary duty by preventing the truth from being made known to investors.

252.     Similarly, Deloitte failed to act upon and further concealed its doubts about Aspirity's ability to continue as a going concern as raised in connection with early quarterly report throughout 2016. Through these failures Deloitte substantially assisted Krieger's breach of fiduciary duty by preventing the truth about Aspirity's financial condition from being made known to investors.

## DEMAND FOR JURY TRIAL

253.     Plaintiffs demand a trial by jury on all counts so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant Plaintiffs and all Class members the following relief against the Defendants:

i.    An order certifying this action as a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Class or Classes and any Subclasses the Court deems appropriate, finding that Plaintiffs are proper representatives of the Class, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class;

ii.   For payment of all principal and interest owed under any Note purchased or renewed during the Class Period;

iii.  For all other recoverable compensatory and other damages sustained by Plaintiffs and the Class;

    iv.   An award of attorneys' fees and costs to counsel for Plaintiffs and the Class as may permitted by applicable law; and

    v.   Such other relief as the Court deems just and proper.

Dated November 22, 2021,        Respectfully submitted,

*/s/ Daniel Centner*
**PEIFFER WOLF CARR KANE & CONWAY, LLP**
Joseph Peiffer (admitted pro hac vice)
Daniel B. Centner (admitted pro hac vice)
Grace A. Hancock (admitted pro hac vice)
1519 Robert C. Blakes Sr. Drive
New Orleans, LA 70130
Telephone: (504) 523-2434
Facsimile: (504) 608-1465
jpeiffer@peifferwolf.com
dcentner@peifferwolf.com
ghancock@peifferwolf.com

**Reinhardt Wendorf & Blanchfield**
Garrett D. Blanchfield
Brant D. Penney
W-1050 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 287-2100
Facsimile: (651)-287-2103
g.blanchfield@rwblawfirm.com
b.penny@rbwlawfirm.com

*Attorneys for Plaintiffs and the Proposed Class*

## Certificate of Service

    I hereby certify that a copy of the foregoing Amended Class Action Complaint was served on all counsel of record via the Court's CM/ECF filing system on November 22, 2021.

*/s/Daniel Centner*
Daniel Centner