# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

K. TAUSIF KAMAL and SAMUEL EDISON,
individually and on behalf of all others
similarly situated,

          Plaintiffs,

v.                                 **MEMORANDUM OF LAW & ORDER**
                                   Civil File No. 21-1549 (MJD/DTS)

BAKER TILLY US, LLP, and DELOITTE, LLP,

          Defendants.

Daniel Centner, Grace Arden Hancock, and Joseph C. Peiffer, Peiffer Wolf Carr Kane Conway & Wise, LLP, and Garrett D. Blanchfield, Jr., and Brant D. Penney, Reinhardt Wendorf & Blanchfield, Counsel for Plaintiffs.

J. Gregory Deis, Sara Norval, and Stanley J. Parzen, Mayer Brown LLP, and Jaime Stilson and Michael E. Rowe, Dorsey & Whitney LLP, Counsel for Defendant Baker Tilly US, LLP.

Timothy Hoeffner and Xenia Nicole Figueroa, McDermott Will & Emery, and Lawrence M. Shapiro, Mark L. Johnson, and X. Kevin Zhao, Greene Espel PLLP, Counsel for Deloitte, LLP.

## I.      INTRODUCTION

This matter is before the Court on Defendant Deloitte LLP's Motion to

Dismiss the Amended Complaint [Docket No. 59] and Defendant Baker Tilly US,

LLP's Motion to Dismiss the Amended Class Action Complaint with Prejudice

[Docket No. 65].  The Court heard oral argument on March 30, 2022.

## II.    BACKGROUND

### A.    Factual Background

According to the Amended Complaint:

#### 1.    Twin Cities Power

In July 2006, Timothy Krieger incorporated Twin Cities Power Holdings

LLC ("Twin Cities Power"), a Minnesota holding company for various

businesses.  (Am. Compl. ¶¶ 1, 22-23.)  Until July 1, 2015, Twin Cities Power was

primarily an energy trading and investment company.  (Id. ¶ 2.)  It served as a

holding company for Minnesota subsidiaries that engaged in wholesale trading,

retail energy services, and diversified investments.  (Id. ¶ 23.)  Twin Cities Power

was under the sole direction and control of Krieger, who was its founder,

majority owner, and control person.  (Id. ¶ 5.)

Twin Cities Power raised most of its operating capital by selling short-term

Renewable Unsecured Subordinate Notes ("Notes") to the general public.  (Am.

Compl. ¶ 3.)  On February 10, 2012, Twin Cities Power registered with the

United States Securities and Exchange Commission ("SEC") and started offering

the Notes for sale to the public in increments from $1,000 to $100,000 and for

terms between 3 months and 10 years.  (Id. ¶¶ 24-25.)  The Note program became

Twin Cities Power's primary source of revenue, and, by the end of 2014, Twin

Cities Power had approximately $22 million in its trading account, mostly from

the Notes program.  (Id. ¶¶ 3, 26.)

### 2. Baker Tilly

Defendant Baker Tilly US, LLP ("Baker Tilly") served as the outside

auditor for Twin Cities Power and its successor from at least 2015 until April 15,

2016.  (Am. Compl. ¶ 11.)  Twin Cities Power and its successor's "normal

practice" was to distribute draft quarterly filings to its auditor before filing.  (Id.

¶ 81.) "[T]he auditors would perform field work and provide guidance in the

form of comments on both the presentation of financials and analysis appearing

in the reports.  These comments included specific accounting directives—how

things should be presented in the interim financials—as well as substantive prose

explaining relevant accounting matters."  (Id.)

### 3. Restructuring

In the spring of 2015, Twin Cities Power began to prepare for a

"restructuring transaction" in which it would rebrand as Aspirity Holdings

("Aspirity") and focus only on retail energy – selling electricity to homeowners

("Restructuring").  (Am. Compl. ¶ 27.)  Before the Restructuring, the vast

majority of Twin Cities Power's operating revenue was realized through its

energy trading subsidiaries; through the Restructuring, ownership of these

subsidiaries was transferred to a newly formed entity entitled Krieger

Enterprises.  (Id. ¶¶ 28-29.)  Aspirity would serve as interim owner of Krieger

Enterprises, and control of Krieger Enterprises would then be transferred to

Krieger.  (Id. ¶ 30.)

Through the Restructuring, Aspirity assumed the more than $20 million in

outstanding Note debt owned by Twin Cities Power and continued to offer

Notes to outside investors.  (Am. Compl. ¶¶ 31-32.)  To offset this debt, Aspirity

classified the assumption of debt as a "Loan" to Krieger Enterprises with a

maturity date of December 30, 2019.  (Id. ¶ 34.)  The Loan would be repaid in

variable installments on an as-needed basis determined by the amount of Note

redemptions over the relevant time period using assets belonging to and

revenues generated by the energy trading subsidiaries being transferred to

Krieger Enterprises.  (Id. ¶¶ 34-35.)  The Loan would be guaranteed by Krieger

Enterprises' energy trading subsidiaries.  (Id.)  After the Restructuring, Aspirity

was a "startup" with a retail energy business that "would take time to develop

into something profitable, leaving Aspirity with no meaningful ability to repay the outstanding Note debt assumed through the Restructuring." (Id. ¶ 33.)

Plaintiffs allege that Krieger viewed the Restructuring as a way to gain unfettered access to the Noteholders' funds. (Am. Compl. ¶¶ 66, 90.) The Loan was not constructed on an arm's length basis – it was created by Krieger between two related companies under his control to allow virtually unrestricted use of the borrowed assets. (Id.) The Loan lacked key indicia of collectability; the personal guarantees and collateral requirements that were represented as being in place in Aspirity's 10-Q were not put in writing. (Id. ¶ 90.)

### 4.   Angell Note

Krieger Enterprises lacked evidence of liquidity needed to support its promised repayment of the Loan. To remedy the situation, Krieger arranged to sell two essentially worthless Krieger Enterprises subsidiaries to a childhood friend, Mike Angell, in exchange for a $20 million promissory note. (Am. Compl. ¶¶ 52-60.) The transaction was consummated on June 1, 2015. (Parzen Decl., Ex. A, Aspirity 2015 Form 10-K at 83.) The Angell Note artificially inflated Krieger Enterprises' financials and made it appear that Krieger Enterprises had the financial ability to pay the Loan. (Am. Compl. ¶ 60.)

The Angell Note was paid with $500,000 cash and a secured promissory note of approximately $20 million.  (Am. Compl. ¶¶ 56-57; Parzen Decl., Ex. A, Aspirity 2015 Form 10-K at 83.)  The $500,000 payment was made by funds Krieger transferred to Angell immediately before the payment was due.  (Am. Compl. ¶ 56; Parzen Decl., Ex. B, Adversary Compl. ¶ 39.)

Baker Tilly "advised Aspirity . . . that the company could not book the entire amount of the Angell Note as an asset effective immediately as there was not a reasonable assurance of collection under applicable accounting standards." (Am. Compl. ¶ 83.)  Angell made one or two payments on the Note and then defaulted on the Note in late 2015 or early 2016.  (Id. ¶ 84.)

### 5.    Approval of the Restructuring

The Restructuring required the approval of the majority of Twin Cities Power's Noteholders.  (Am. Compl. ¶ 36.)  In June 2015, the Restructuring proposal was submitted to the Noteholders.  (Id.)  The Noteholders approved the restructuring, and the Loan of $22 million to Krieger Enterprises closed on July 1, 2015.  (Id. ¶ 39.)

On July 1, 2015, Aspirity filed a Form 8-K announcing that the Restructuring had been approved and that Aspirity's assumption of Twin Cities

Power's outstanding Note debt would be categorized as a "Loan" on Aspirity's books.  (Am. Compl. ¶ 39.)  At that time, Baker Tilly was Aspirity's auditor.  (Id. ¶ 40.)

### 6.    Second Quarter 2015 10-Q

In July 2015, Aspirity's CFO, Wiley Sharp, told Baker Tilly that Aspirity's presentation about the Loan would be reviewed by Aspirity's public investors – including the Noteholders – and that Aspirity's goal with the Restructuring was to increase public investment in Aspirity by presenting it as a retail energy business with a more "predictable earnings stream."  (Am. Compl. ¶¶ 43-46.)  In telephone calls between Sharp and Baker Tilly in July and August 2015, "Baker Tilly was made aware that Noteholders would rely on Baker[] Tilly's opinions regarding, *inter alia*, Krieger Enterprises' ability to service the Term Loan, which in turn would satisfy the Note obligations."  (Id. ¶ 49.)

On August 7, 2015, in advance of the issuance of the 10-Q for the second quarter of 2015, Baker Tilly issued a memorandum to Aspirity providing a list of "warning indicators" about the Restructuring.  These indicators included the thinly capitalized/highly leveraged borrowers on the payment side and focused

on Angell's lack of liquidity and Krieger Enterprises' insufficient capital.  (Am. Compl. ¶ 82.)

On August 12, 2015, Baker Tilly wrote a draft quarterly review results memorandum that provided Aspirity with specific language to include in its 10-Q for the second quarter of 2015 regarding "material weaknesses" in Aspirity's presentation of its financials, specifically, "[a] control deficiency regarding ineffective controls over accounting and financial disclosures associated with accounting and reporting complex and unusual transactions."  (Am. Compl. ¶ 88.)

The final August 12, 2015, quarterly review results memo provided to Aspirity by Baker Tilly identified a "significant deficiency" related to "accounting and reporting requirements of these significant and complex transactions" involved in the Restructuring.  (Parzen Decl., Ex. D, Aug. 12, 2015, Quarterly Results Review Memo at 5.)

The Second Quarter 2015 10-Q filed by Aspirity did not include a "material weakness" warning.  (Am. Compl. ¶ 88.)

### 7.    Third Quarter 2015 10-Q

Aspirity's Third Quarter 2015 10-Q presented the Loan as an "intercompany relationship" that, although eliminated in consolidation, "was constructed on an arm's length basis, contains customary protective provisions for the lender including certain guarantees, collateral, and covenants, and ensures that the cash flows generated by the Legacy Businesses may continue to be used to pay the interest and principal on the outstanding notes." (Am. Compl. ¶ 89.)

### 8.    Going Concern Qualification Concern

In November 2015, Baker Tilly provided its annual audit plan to Aspirity. (Am. Compl. ¶ 117.)  The audit plan stated that Baker Tilly planned to evaluate Krieger Enterprises' "significant risk" of "fraud." (Id. ¶¶ 117-119.)  Early drafts of Baker Tilly's audit report for 2015 indicated "substantial doubt" about Aspirity's "ability to continue as a going concern for a reasonable period of time." (Id. ¶ 96.)  However, the going concern doubt was eliminated from later drafts of the report, replaced with the statement that Baker Tilly would be "reviewing management's plans with regards to the entity's ability to continue as a going concern." (Id. ¶ 97.)

9

9.    2015 10-K

On April 15, 2016, Aspirity released its 2015 10-K, which described the

Loan as an arm's length transaction giving rise to a collectible asset that netted

out Aspirity's obligations on the Notes.  (Am. Compl. ¶¶ 111-13.)  Baker Tilly

certified that the statements in the 10-K fairly presented Aspirity's financial

position as of the end of 2015.  (Id. ¶¶ 113, 238.)  However, Baker Tilly had failed

to perform any of the related party and/or fraud detection analysis required of it

under the Public Company Accounting Oversight Board's ("PCAOB") Auditing

Standards.  (Id. ¶¶ 74, 104-07, 208-10.)  No going concern was disclosed in the 10-

K.  (Id. ¶ 100.)  At that time, Baker Tilly had knowledge of red flags calling into

question the legitimacy and collectability of the Angell Note.  (Id. ¶ 69.)

Krieger withdrew approximately $6 million from Krieger Enterprises in

2015.  (Am. Compl. ¶ 66.)

The 2015 10-K provided that Aspirity did not expect significant revenue

until mid-2016 at the earliest so, until that time, the Loan was the sole source of

repayment of the Notes.  (See Parzen Decl., Ex. A, Aspirity 2015 Form 10-K at 27.)

The 10-K showed a consolidated financial statement (including Krieger

Enterprises) and showed that Aspirity had $9 million more in liabilities than

assets and had more than $4 million in losses.  (2015 10-K at 57.)  It disclosed the

10

losses, Aspirity's negative working capital, a material weakness in internal controls, and $6 million in distributions.  (Id. at 48, 61, 65, 106.)

The 2015 10-K disclosed that Krieger Enterprises was almost completely owned by Krieger.  (2015 10-K at 96.)  Because the Loan created an ongoing relationship between Krieger Enterprises and Aspirity, the 10-K stated that Aspirity concluded that it "may hold a controlling financial interest in Enterprises" because of the "nature and size of the Term Loan between the two parties that could result in losses" and therefore that Krieger Enterprises was a variable interest entity that should be consolidated.  (Id. at 66.)  And, based on Baker Tilly's advice, Aspirity included Krieger Enterprises in the presentation of its consolidated financial information.  (Am. Compl. ¶ 49.)

Because Krieger Enterprises was included in Aspirity's consolidated financial statement, "[a]ll significant consolidated transactions and balances have been eliminated in consolidation."  (2015 10-K at 65.)  Thus, the consolidated financial statements did not reflect the Loan as an asset because consolidation eliminated it.  (Am. Compl. ¶ 101.)  Plaintiffs allege that this was incorrect because Krieger Enterprises could not repay the Loan.  (Id.)

11

### 10.   Replacement of Baker Tilly with Deloitte

In February 2016, because of the disagreements between Baker Tilly and management over consolidation and accounting for the Angell Note, Aspirity fired Baker Tilly and hired Defendant Deloitte, LLP[1] ("Deloitte") as its external auditor for year-end 2016.  (Am. Compl. ¶¶ 91-92.)

Deloitte had provided "informal consulting work for Aspirity since July 2015," while Baker Tilly was still serving as Aspirity's auditor.  (Am. Compl. ¶ 124.)  Plaintiffs assert that Deloitte's "guidance" was "intended to help Aspirity convince Baker Tilly that Krieger Enterprises [financial information] did not need to be presented" in Aspirity's SEC filings.  (Id. ¶ 91.)  There is no allegation that Deloitte had any role in the 2015 Restructuring or issued any opinion regarding Aspirity's 2015 financial statements.

When Deloitte formally took over the audit engagement from Baker Tilly, accounting standards dictated that Deloitte was required to communicate with Baker Tilly regarding possible fraud and internal control issues and transactions with related parties.  (Am. Compl. ¶ 125.)

---

[1] Deloitte asserts that Deloitte provides no audit or other services.  Instead, a legally distinct entity, Deloitte & Touche LLP, served as Aspirity's independent auditor.

12

Deloitte served as Aspirity's independent auditor from February 2016 until mid-2017, beginning with the First Quarter 2016 10-Q.  (Am. Compl. ¶¶ 92, 124.)  Aspirity's normal practice was to circulate its quarterly reports to its auditors and incorporate their substantive guidance into those reports.  (Id. ¶ 137.)  "Deloitte partner Patrick Larson was heavily involved in the preparation of Aspirity's quarterly reports."  (Id. ¶ 138.)

By May 11, 2016, before Aspirity issued its first quarterly report, Deloitte wrote a draft report indicating items that called into question Aspirity's ability to continue as a going concern for a reasonable period of time, including working capital deficits, net loss, and accumulated deficits.  (Am. Compl. ¶¶ 141-42.)  In the report, Larson considered amending the 10-K to clarify Aspirity's net equity and noted that "debt holders would be concerned with the net equity of the Company as a measure of financial position."  (Id. ¶¶ 143-44.)

## 11.    First Quarter 2016 10-Q

In June 2016, Aspirity filed its First Quarter 2016 Form 10-Q with the SEC. The First Quarter 2016 Form 10-Q states that Aspirity "prepared the foregoing unaudited consolidated financial statements."  (Johnson Decl., Ex. B, First Quarter 2016 10-Q at 16.)  The Form 10-Q states that, for additional information,

13

readers should refer to Aspirity's "audited consolidated financial statements and the accompanying notes for the years ended December 31, 2015, and 2014 included in our 2015 Form 10-K," (<u>Id.</u> at 16), which were audited by Baker Tilly, not Deloitte.

Beginning with the first quarter of 2016, "Aspirity decided that it would no longer consolidate Krieger Enterprises as a variable interest entity." (Am. Compl. ¶ 129.) "This was a material change from the prior year, where the Krieger Loan had been treated as a related company transaction eliminated in consolidation from Aspirity's balance sheet." (<u>Id.</u>) This change was disclosed in Aspirity's First Quarter 2016 10-Q, which further stated Aspirity's opinion that Krieger Enterprises "likely has sufficient liquidity and operating success to service the debt going forward." (<u>Id.</u> ¶ 130.)

Deloitte informed Aspirity that deconsolidation of Krieger Enterprises from Aspirity's balance sheet presented "a fraud risk." (Am. Compl. ¶ 132.)

### 12.    Second Quarter 2016 10-Q

"In August 2016 Aspirity issued a 10-Q for the second quarter of 2016 stating that '[Krieger] Enterprises likely has sufficient liquidity and operating success to continue to service the debt going forward.'" (Am. Compl. ¶ 145.)

Deloitte reviewed this 10-Q.  (Id. ¶ 146.)  "Deloitte made no inquiry to assess Aspirity's true financial condition as of the date of the second quarter 2016 10-Q."  (Id. ¶ 148.)  However, Deloitte did provide a report to Aspirity that "reflected [Deloitte's] doubts about Aspirity's ability to continue as a going concern—a concern that was not disclosed in the 10-Q."  (Id. ¶ 149.)

Aspirity's Second Quarter 2016 Form 10-Q contains no representation attributed to Deloitte, instead presenting only the "unaudited financial statements" prepared by Aspirity's management.  (Johnson Decl., Ex. C, Second Quarter 2016 Q2 at 14.)

By this time, Krieger was working to renegotiate the Loan due to his inability to make the required payments.  (Am. Compl. ¶ 152.)  He withdrew $11 million from Krieger Enterprises in 2016.  (Id. ¶ 66.)

### 13.    Third Quarter 2016 10-Q

On November 1, 2016, the Loan was amended to implement a fixed monthly payment schedule.  (Am. Compl. ¶ 153.)  Deloitte questioned whether the amendment would require reclassification from an asset to equity.  (Id. ¶ 154.)

After the Loan amendment, Aspirity released its Third Quarter 2016 10-Q, which stated Aspirity's belief that Krieger Enterprises would be able to service the Loan, such that presentation of the Loan as an asset was proper.  (Am. Compl. ¶ 242.)  The Third Quarter 2016 Form 10-Q presented only "unaudited consolidated financial statements" prepared by Aspirity and made no reference to Deloitte.  (Johnson Decl., Ex. D, Third Quarter 2016 Form 10-Q at 14.)

Simultaneously with the issuance of the Third Quarter 2016 10-Q, Aspirity issued a press release discussing the "accounting treatment" of the Loan.  (Am. Compl. ¶ 157.)  Deloitte's Larson "provided comments on that Press Release before it was issued, including comments on the discussion of assets on the Company's balance sheet for the quarter;" one of his "comments suggested including language to make sure risks were made 'clear to the readers and debt investors.'"  (Id. ¶ 158.)

During a November 19, 2016, Aspirity audit committee meeting, at which Deloitte was present, the committee discussed the "upcoming going concern disclosure in the annual filing at year end."  (Am. Compl. ¶ 159.)

### 14.    2016 10-K

On April 28, 2017, Aspirity filed its 2016 10-K with the SEC.  (Am. Compl. ¶ 162.)  The 2016 Form 10-K contained the only audit opinion issued by Deloitte. (Johnson Decl., Ex. E, 2016 Form 10-K at 40.)  Deloitte represented that it had audited Aspirity's financial statements and opined that Aspirity's "consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2016."  (Id.)  Plaintiffs do not allege that the audit opinion was inaccurate.

The 10-K formally reclassified the Loan from a receivable to a contra-equity account, i.e., an account with a negative balance.  (Am. Compl. ¶¶ 163-64.) Deloitte's audit opinion included with the 10-K opined that Aspirity's "recurring losses from operations, members' deficit, and lack of sufficient cash flows to meet its obligations, including repayment of renewable unsecured subordinated notes, and sustain its operations raise substantial doubt about its ability to continue as a going concern."  (Id. ¶ 165.)  Deloitte's audit opinion and going concern warning prevented Aspirity from selling any more Notes because "no reasonable investor would purchase a promissory note from an entity not expected to survive the coming year."  (Id. ¶ 171.)

### 15.    Aspirity's Bankruptcy

From 2015 through mid-2017, Krieger had withdrawn approximately $22 million Krieger Enterprises; during this time, Krieger Enterprises had suffered substantial operating losses each year.  (Id. ¶¶ 5, 66-68.)

Soon after issuance of the 2016 10-K, Krieger stopped paying on the Loan, and Aspirity was unable to sell any more Notes, causing Aspirity to be unable to pay on its Notes.  (Am. Compl. ¶¶ 171-72, 174-75.)  Aspirity collapsed financially and failed to pay any of the Noteholders.  (Id. ¶ 175.)

In June 2017, Aspirity entered bankruptcy.  (Am. Compl. ¶¶ 6, 71.)  The bankruptcy trustee sued Krieger for fraud, breach of fiduciary duty, and other claims.  (Id. ¶ 6.)  Krieger settled with the trustee for $725,000.  (Id.)

### 16.    Plaintiffs

Plaintiffs K. Tausif Kamal and Samuel Edison were among approximately 800 Noteholders who purchased or renewed Aspirity Notes between July 1, 2015, and April 28, 2017.  (Am. Compl. ¶¶ 8-9, 184-86.)  When Aspirity could not repay the Noteholder debt and entered bankruptcy in June 2017, Plaintiffs and other Noteholders lost money on their investments.  (Id. ¶¶ 173-75.)

### B.    Procedural History

On July 1, 2021, Kamal and Edison filed a putative class action Complaint against Deloitte and Baker.  [Docket No. 1]  On November 22, 2021, Plaintiffs filed an Amended Complaint against Baker Tilly and Deloitte.  [Docket No. 55]  The Amended Complaint asserts: Count 1: Negligence; Count 2: Aiding and Abetting Fraud; and Count 3: Aiding and Abetting Breach of Fiduciary Duty.

Defendants now move to dismiss all claims against them.

III.   DISCUSSION

A.   Standard for Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted.  In reviewing a motion to dismiss, the Court takes all facts alleged in the complaint to be true.  Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

Id. (citations omitted).

19

In deciding a motion to dismiss, the Court considers the complaint and

"materials that are part of the public record or do not contradict the complaint, as

well as materials that are necessarily embraced by the pleadings.  For example,

courts may consider matters of public record, orders, items appearing in the

record of the case, and exhibits attached to the complaint."  Greenman v. Jessen,

787 F.3d 882, 887 (8th Cir. 2015) (citations omitted).  Here, the Amended

Complaint contains extensive reference to and quotes from Aspirity's SEC

filings.

### B.      Count 1: Negligent Misrepresentation

In Count 1, Plaintiffs assert a claim for negligent misrepresentation and

information negligently supplied for the guidance of others against both

Defendants.

### 1.      Accountants' Liability to Third Parties for Negligence

In Minnesota, "[t]he Restatement (Second) of Torts § 552 (1977) sets out the

criteria for accountants' liability to third parties who rely on the accountants'

negligent audits."  NorAm Inv. Servs., Inc. v. Stirtz Bernards Boyden Surdel &

Larter, P.A., 611 N.W.2d 372, 374 (Minn. Ct. App. 2000).

(1) One who, in the course of his business, profession or
employment, or in any other transaction in which he has a pecuniary

20

interest, supplies false information for the guidance of others in their
business transactions, is subject to liability for pecuniary loss caused
to them by their justifiable reliance upon the information, if he fails
to exercise reasonable care or competence in obtaining or
communicating the information.

(2) * * * the liability stated in Subsection (1) is limited to loss suffered

> (a) by the person or one of a limited group of persons for
> whose benefit and guidance he intends to supply the
> information or knows that the recipient intends to supply it;
> and

> (b) through reliance upon it in a transaction that he intends
> the information to influence or knows that the recipient so
> intends or in a substantially similar transaction.

Id. at 374–75 (quoting Restatement (Second) of Torts § 552 (1977)).

### 2.    Deloitte

Plaintiffs fail to point to any specific false information in Aspirity's 10-Qs,

audited 2016 10-K, or press releases that originated with Deloitte.

With regard to Aspirity's 10-Qs and the November 2016 press release,

Plaintiffs fail to point to any of the false statements that originated with Deloitte.

The Amended Complaint only vaguely alleges that Deloitte was "heavily

involved in the preparation of Aspirity's quarterly reports" and offered direction

"as to how to present Krieger Enterprises financials in Aspirity's [spring 2016]

quarterly report."  (Am. Compl. ¶¶ 138-139.)  In fact, the Amended Complaint

21

alleges that, instead of providing false or misleading information to Aspirity to be passed on to third parties, Deloitte warned Aspirity that deconsolidation of Krieger Enterprises from Aspirity's balance sheet presented "a fraud risk." (Am. Compl. ¶ 132.) The only allegation regarding specific information or language that Deloitte suggested including in the November 2016 press release is that Deloitte recommended that Aspirity include "language to make sure risks were made 'clear to the readers and debt investors.'" (Id. ¶ 158.) None of these are false or misleading statements.

Additionally, Minnesota law provides that a third party is not justified in relying on "unaudited, compiled financial statements in which the accountants have expressed no opinion." Dakota Bank v. Eiesland, 645 N.W.2d 177, 181 (Minn. Ct. App. 2002). The 10-Qs were unaudited financial statements that stated they were prepared by Aspirity, not Deloitte. The November 2016 press release was not an audited statement and did not attribute any representation to Deloitte. The 2016 10-K was audited by Deloitte; however, the information in that 10-K is not alleged to be false. The 2016 10-K did include a going concern warning and indicated that Aspirity would not be able to repay the Notes.

Because Plaintiffs fail to allege that Deloitte provided any false information to them upon which they could rely, the negligence claim against Deloitte must be dismissed.

### 3.     Baker Tilly

#### a)     Aspirity's Quarterly Reports

Baker Tilly is not liable for the allegedly false statements in the 10-Qs because there is no allegation that it supplied false information that was presented in those filings, the 10-Qs are unaudited, they stated that they were prepared by Aspirity, and they contain no indication that they were prepared by Baker Tilly.  See, e.g., Dakota Bank, 645 N.W.2d at 181-82.

#### b)     Aspirity's 2015 10-K

Plaintiffs assert that Baker Tilly falsely certified that Aspirity's year-end financial statements contained in its 2015 10-K, which Baker Tilly audited, presented fairly, in all material respects, the financial position of Aspirity as of December 31, 2015.  They allege that information was false because the Loan was not an arm's length transaction, and Krieger Enterprises lacked evidence of liquidity needed to support repayment of the loan.  Baker Tilly raises various arguments regarding whether, in fact, it should have included a warning

regarding a going concern qualification or lack of internal controls, which are better addressed after discovery at summary judgment or in trial.

The Amended Complaint adequately alleges multiple facts from which it could be inferred that Baker Tilly should have known that these representations were false, including that Baker Tilly had internally considered a going concern notification and a material weakness designation and planned to evaluate Krieger Enterprises' "significant risk" of fraud.  (See, e.g., Am. Compl. ¶¶ 82, 88, 96, 117-19.)

Plaintiffs allege that they "relied on the accuracy on the information contained in all of Aspirity's public filings, including but not necessarily limited to the 10-Qs, 8-Ks, and 10-Ks discussed above."  (Am. Compl. ¶¶ 178-81, 188.)  Thus, they allege that they relied on the 2015 10-K.  An investor can justifiably rely on an audited financial statement filed with the SEC, and Plaintiffs persuasively argue that they had no other way to obtain information about Aspirity's inner workings.

Finally, at the pleadings stage, Plaintiffs adequately allege that they are in the appropriate limited group.  In Minnesota, to have standing to sue an auditor for negligent misrepresentation, the plaintiffs must fall within "'a limited group

24

of persons for whose benefit and guidance [the defendant] intends to supply the

information or knows that the recipient intends to supply it.'" NorAm Inv.

Servs., Inc. v. Stirtz Bernards Boyden Surdel Larter, P.A., 611 N.W.2d 372, 375

(Minn. Ct. App. 2000) (quoting § 552(2) of the Restatement (Second) of Torts).

An accountant cannot be liable to every third party who relies on the

accountant's audited statement contained in an SEC filing.  Loop Corp. v.

McIlroy, No. A04-362, 2004 WL 2221619, at *4 (Minn. Ct. App. Oct. 5, 2004).

Here, Plaintiffs plead that Baker Tilly had specific knowledge that the intent of

Aspirity's 10-K filing was to convince Noteholders to continue investing in

Aspirity.  (See, e.g., Am. Compl. ¶ 49.)  At the pleading stage, Plaintiffs have

sufficiently alleged a claim for negligent misrepresentation against Baker Tilly

based on the 2015 10-K.

### C.    Counts 2-3: Aiding and Abetting

Plaintiffs allege that Defendants aided and abetted fraud and aided and

abetted breach of fiduciary duty.  The Court concludes that Plaintiffs lack

standing to assert the aiding and abetting claims because they are derivative

claims belonging exclusively to the Aspirity bankruptcy trustee; additionally,

the claims fail on the merits.

25

### 1.    Standing: Whether Plaintiffs' Claims Are Derivative

To promote the orderly resolution of all claims and prevent creditors from racing to the courthouse to achieve preferential recoveries, the bankruptcy trustee has exclusive standing to assert causes of action belonging to the estate.  General claims—those with no particularized injury arising from them—that can be brought by any creditor of the debtor, must be brought by the trustee, for the benefit of all creditors.  In contrast, particularized claims are specific to a plaintiff, in that the injury is directly traced to the non-debtor's conduct.

Ritchie Special Credit Invs., Ltd. v. JP Morgan Chase & Co., Civil No. 14-4786 (DWF/FLN), 2021 WL 2686079, at *4 (D. Minn. June 30, 2021) (cleaned up and citations omitted).

"Whether a particular cause of action arising under state law belonged to the debtor in bankruptcy or to someone else is determined by state law."  In re Senior Cottages of Am., LLC, 482 F.3d 997, 1001 (8th Cir. 2007).  "Under Minnesota law [], waste and misappropriation of corporate assets are traditional derivative claims that rightfully belong to the corporation."  Id. at 1002 (citation omitted).  "If the corporation owned a cause of action against the principal who breached a duty, it follows that it also owns the cause of action for aiding and abetting the principal's breach."  Id.  Thus, Minnesota courts have held that

creditors lacked standing to bring a malpractice suit against a corporation's accountants for negligence causing loss to the corporation; instead, the malpractice claim belonged to the injured

corporation itself [because] "[t]he noteholders' alleged injury exists only because [the corporation] was injured, and the amount of their injury is wholly dependent on the diminution in the value of [the corporation's] assets."

Id. (quoting Nat'l City Bank v. Coopers & Lybrand, 409 N.W.2d 862, 869 (Minn. Ct. App. 1987)).

The Court concludes that Plaintiffs lack standing to bring the aiding and abetting claims. Plaintiffs seek recovery for losses that are the result of and derivative of Aspirity's losses. Plaintiffs do not allege that Krieger stole money directly from the Noteholders. Rather, they allege that Krieger misappropriated funds from Aspirity, and Plaintiffs suffered losses when Krieger's theft left Aspirity unable to repay their Notes. The primary injury was to the company, and Plaintiffs' injuries derive from the company's injury. The entire Aspirity estate and all of its creditors were victims of Krieger's alleged torts. (See, e.g., Am. Compl. ¶ 5 (alleging that Noteholders lost money because Krieger "appropriated approximately $22 million in cash and accounts," which led to "a $22 million 'IOU' to the company's Noteholders that remains unpaid to this day").) The injuries Plaintiffs allegedly suffered are "no different from the harm suffered" by Aspirity's creditors generally. In re Cabrini Med. Ctr., 489 B.R. 7, 22 (S.D.N.Y. 2012). See also Ritchie Special Credit Invs., Ltd., 2021 WL 2686079, at

*5 (holding aiding and abetting claims were property of the bankruptcy estates when plaintiff alleged "the same injury suffered by all creditors who loaned and lost money in the scheme"); Greenpond S., LLC v. Gen. Elec. Capital Corp., 886 N.W.2d 649, 657 (Minn. Ct. App. 2016) (dismissing aiding and abetting fraud claim as derivative); Nat'l City Bank v. Coopers & Lybrand, 409 N.W.2d 862, 868 (Minn. Ct. App. 1987) ("The allegations show, however, that the noteholders were injured only indirectly, like all of GCC's creditors, by a reduction in the value of the corporation's assets.").  In fact, the bankruptcy trustee already brought claims for fraud and breach of fiduciary duty against Krieger.  (Am. Compl. ¶ 6.)

Plaintiffs allege no specific misleading statements by Deloitte directed to Plaintiffs that Plaintiffs claim induced them to purchase or renew Notes.  Cf. Nw. Racquet Swim & Health Clubs, Inc. v. Deloitte & Touche, 535 N.W.2d 612, 614-15, 619 (Minn. 1995).  As to Baker Tilly, Plaintiffs only allege a false statement with regard to the 2015 10-K.  To the extent that Plaintiffs have standing to assert aiding and abetting based on Baker Tilly's conduct with regard to the 2015 10-K, that claim fails on the merits.

## 2.    Elements of Aiding and Abetting Tortious Conduct

Even if Plaintiffs have standing, they have failed to plead aiding and

abetting claims against Deloitte or Baker Tilly.

Under Minnesota law, "all who actively participate in any manner in the

commission of a tort, or who procure, command, direct, advise, encourage, aid,

or abet its commission, or who ratify it after it is done are jointly and severally

liable for the resulting injury." Witzman v. Lehrman, Lehrman & Flom, 601

N.W.2d 179, 185-86 (Minn. 1999) (cleaned up and citation omitted).  A claim for

aiding and abetting the tortious conduct of another has three elements:

> (1) the primary tort-feasor must commit a tort that causes an injury
> to the plaintiff;
>
> (2) the defendant must know that the primary tort-feasor's conduct
> constitutes a breach of duty; and
>
> (3) the defendant must substantially assist or encourage the primary
> tort-feasor in the achievement of the breach.

Id. at 187 (citing Restatement (Second) Torts § 876(b); Ezzone v. Riccardi, 525

N.W.2d 388, 398 (Iowa 1994)).  The second and third elements are evaluated "in

tandem" – "the weaker the evidence of knowledge is, the greater the showing of

substantial assistance must be."  Zayed v. Associated Bank, N.A., 913 F.3d 709,

720 (8th Cir. 2019).

29

"[I]n cases where aiding and abetting liability is alleged against professionals, we will narrowly and strictly interpret the elements of the claim and require the plaintiff to plead with particularity facts establishing each of these elements." Witzman, 601 N.W.2d at 187.  A defendant cannot be liable for "the provision of routine professional services," "[t]he mere presence of the particular defendant at the commission of the wrong, or his failure to object to it." Id. at 189 (citations omitted).  "[A]iding and abetting liability is based on proof of a scienter—the defendants must *know* that the conduct they are aiding and abetting is a tort." Id. at 186.

### 3.     Actual Knowledge

"Under Minnesota law, the scienter (knowledge requirement) for aiding and abetting is 'actual knowledge.'" Zayed, 913 F.3d at 715 (citation omitted).  "A plaintiff must show more than awareness of the conduct in question, that it raised red flags, or even that it amounted to gross negligence, but must show that the defendant was aware of the wrongfulness of the challenged conduct." Id. (cleaned up and citation omitted).  Actual knowledge is more than awareness that conduct raised "'red flags' that, with the benefit of hindsight, should have prompted further investigation or inquiry." Id. at 716.

30

Plaintiffs fail to plead that, at the relevant times, Defendants actually knew

Krieger and Aspirity were committing fraud and breach of fiduciary duty.

Rather, the Amended Complaint alleges that Aspirity had actual knowledge of

the torts (see, e.g., Am. Compl. ¶¶ 52-54, 230), but that Defendants merely should

have known that there was fraud and breach of fiduciary duty, that there were

"red flags," or that Defendants had "constructive knowledge."  (See, e.g., Am.

Compl. ¶¶ 69, 82, 103, 107.)  However, negligence, "red flags," and constructive

knowledge are insufficient to support and aiding and abetting claim:

> Knowledge is a crucial element in aiding and abetting cases.  While
> knowledge may be shown by circumstantial evidence, courts stress
> that the requirement is *actual* knowledge and the circumstantial
> evidence must demonstrate that the aider-and-abettor *actually knew*
> of the underlying wrongs committed.  Constructive knowledge will
> not suffice, and it is not enough to plead awareness of the conduct in
> question, that it raised red flags, or even that it amounted to gross
> negligence.  Rather, [the plaintiff] must plead facts plausibly
> suggesting [that the defendant] was aware of the *wrongfulness* of the
> challenged conduct.

Varga v. U.S. Bank Nat. Ass'n, 952 F. Supp. 2d 850, 857–58 (D. Minn. 2013)

(cleaned up and citations omitted), aff'd, 764 F.3d 833 (8th Cir. 2014).

### D.    Leave to Amend

Plaintiffs have not sought leave to amend their Amended Complaint.

Plaintiffs also stipulated that they would not seek leave to amend their complaint

again in response to these motions to dismiss.  [Docket No. 53]  There is no

reason to believe that a third amended Complaint would not be futile as to the

claims dismissed by the Court.  Therefore, dismissal is with prejudice.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1.    Defendant Deloitte, LLP's Motion to Dismiss the Amended
      Complaint [Docket No. 59] is **GRANTED**, and the claims
      against Deloitte, LLP are **DISMISSED WITH PREJUDICE**.

2.    Defendant Baker Tilly US, LLP's Motion to Dismiss the
      Amended Class Action Complaint with Prejudice [Docket No.
      65] is **GRANTED IN PART** and **DENIED IN PART** as
      follows: Count 1: Negligence against Baker Tilly US, LLP
      **REMAINS** based on the 2015 10-K; and Count 2: Aiding and
      Abetting Fraud, and Count 3: Aiding and Abetting Breach of
      Fiduciary Duty are **DISMISSED WITH PREJUDICE**.


Dated:  April 7, 2022                    s/Michael J. Davis
                                         Michael J. Davis
                                         United States District Court

32